# UNITED STATES *v.* CARMACK.

No. 40.   Argued October 18, 1946.—Decided December 9, 1946.

*John J. Cooney* argued the cause for the United States. With him on the brief were *Solicitor General McGrath, Assistant Attorney General Bazelon, Roger P. Marquis* and *Dwight D. Doty.*

*I. R. Kelso* argued the cause for respondent. With him on the brief were *Homer Hall* and *Robt. D. Abbott.*

MR. JUSTICE BURTON delivered the opinion of the Court.

This proceeding was instituted by the United States to condemn land as a site for a post office and customhouse in the City of Cape Girardeau, Missouri, in reliance upon several federal statutes, including the general Condemnation Act of August 1, 1888, and the Public Buildings Act of May 25, 1926.[1] The City and site were selected by the Federal Works Administrator and the Postmaster General acting jointly under the Public Buildings Act. The principal

---

[1] ". . . in every case in which the Secretary of the Treasury or any other officer of the Government has been, or hereafter shall be, authorized to procure real estate for the erection of a public building or for other public uses he shall be, and hereby is, authorized to acquire the same for the United States by condemnation, under judicial process, whenever in his opinion it is necessary or advantageous to the Gov-

issue is: Was the Federal Works Administrator authorized by the foregoing statutes to acquire by condemnation land held in trust and used by the City for such public purposes as those of a local park, courthouse, city hall and public library?

In 1941, the United States petitioned the United States District Court for the Eastern District of Missouri to condemn as a site for a United States post office and customhouse about one and one-half acres, near the center of the City of Cape Girardeau, together with the improvements thereon except a public library building. This site was part of a four-acre public park and the improvements to be condemned included a building used as the county

ernment to do so, . . . ." Sec. 1, Condemnation Act of August 1, 1888, 25 Stat. 357, 40 U. S. C. § 257.

"To enable the Federal Works Administrator to provide suitable accommodations . . . for courthouses, post offices, immigration stations, customhouses, marine hospitals, quarantine stations, and other public buildings of the classes under the control of the Federal Works Agency in the States, Territories, and possessions of the United States, he is hereby authorized and directed to acquire, by purchase, condemnation, or otherwise, such sites and additions to sites as he may deem necessary, . . . *Provided,* That . . . insofar as relates to buildings to be used in whole or in part for post-office purposes, the Federal Works Administrator, under regulations to be prescribed by him, shall act jointly with the Postmaster General in the selection of towns or cities in which buildings are to be constructed and the selection of sites therein: . . . ." 40 U. S. C. § 341. This is codified from § 1 of the Public Buildings Act of May 25, 1926, 44 Stat. 630–631, as modified by Reorganization Plan I, §§ 301–303, 53 Stat. 1426–1427, 5 U. S. C. following § 133t. See also, 40 U. S. C. §§ 342–350 and the balance of the original Act.

The petition likewise relied upon the Declaration of Taking Act of February 26, 1931, 46 Stat. 1421, 40 U. S. C. §§ 258a–258e; Third Deficiency Appropriation Act, fiscal year 1937, 50 Stat. 755, 773; Federal Public Buildings Appropriation Act of 1938, 52 Stat. 818; and the Reorganization Act of 1939, 53 Stat. 561, 5 U. S. C. § 133, *et seq.,* under which Reorganization Plan I was submitted to Congress and made effective July 1, 1939, 53 Stat. 813, 5 U. S. C. § 133s.

courthouse and city hall, a memorial fountain, a small memorial monument and a portion of a bandstand. The library building apparently was to be removed by its owners on 30 days' notice from the United States.

The petition included as parties defendant the City and County, numerous officials and all known and unknown heirs or others who might claim an interest in this site especially through those who conveyed it, in trust, in 1807 to the Commissioners of the District or, in trust, in 1820 to the inhabitants of the Town of Cape Girardeau. Respondent was the only defendant to file an answer. Finding that she had no interest permitting her to maintain the defenses she asserted, the District Court entered a preliminary decree in favor of the United States. On respondent's appeal the Circuit Court of Appeals remanded the cause for further proceedings consistent with its opinion holding that the respondent had a special interest entitling her to object to the property being taken for a purpose destructive of the public use to which it had been dedicated by her ancestors. *Carmack* v. *United States,* 135 F. 2d 196.

In 1944, on retrial before a different judge, the District Court recognized the respondent as entitled to contest the condemnation and, at the direction of the Circuit Court of Appeals, heard evidence as to whether or not the officials of the United States acted capriciously and arbitrarily in selecting this site. It held that "the selection of the site described in the petition, under all the facts referred to, amounts in law to an arbitrary and unnecessary act" and dismissed the petition. *United States* v. *Certain Land, Etc.,* 55 F. Supp. 555, 564. The Circuit Court of Appeals affirmed the judgment on the ground that the Federal Works Administrator and the Postmaster General did not have sufficient statutory authority "to take the particular land sought to be condemned." It then expressly found it unnecessary to consider whether or not the

federal officials had acted "capriciously and arbitrarily." *United States* v. *Carmack,* 151 F. 2d 881, 882. Because of the importance of the construction of the statutes authorizing the condemnation of land for federal uses, we granted certiorari. 327 U. S. 775.[2]

Both the general Condemnation Act and the Public Buildings Act [3] expressly authorized the acquisition of land by the United States by condemnation as a site for a United States post office, customhouse or courthouse. Neither Act expressly named the City or designated the site to be condemned in this case. Neither expressly stated whether or not sites already in use for conflicting federal, state or local public purposes were subject to condemnation. The Condemnation Act supplemented the federal right "to procure real estate for the erection of a public building or for other public uses," by adding to it a general federal power of condemnation under judicial process to be exercised by an officer of the Government "whenever in his opinion it is necessary or advantageous to the Government to do so." The Public Buildings Act, as an incident to an original $150,000,000 program, gave authority and direction to the Secretary of the Treasury (later substituting the Federal Works Administrator) "to acquire, by purchase, condemnation, or otherwise, such

---

[2] The right of the respondent to contest the condemnation turns upon the effect of the deeds, executed by certain of her ancestors in 1807 and 1820, pursuant to which this site long has been put to local public use. Her interest, turning largely on Missouri law, was upheld by the Circuit Court of Appeals, following the first trial, *Carmack* v. *United States,* 135 F. 2d 196, and, as we do not have to question that interest in order to reach our decision, we do not reexamine it. *Bd. of Regents, Normal School Dist. No. 3* v. *Painter,* 102 Mo. 464, 14 S. W. 938; *Mott* v. *Morris,* 249 Mo. 137, 155 S. W. 434; and 25 Stat. 357, 40 U. S. C. § 258. The proceeding to condemn the land being *in rem,* the jurisdiction of the court does not turn upon her participation in the case. Cf. *United States* v. *Dunnington,* 146 U. S. 338, 352; *In re Condemnation Suits by United States,* 234 F. 443, 445.

[3] See note 1, *supra.*

sites . . . as he may deem necessary, . . . ." It specified that as to "buildings to be used in whole or in part for post-office purposes, the Federal Works Administrator, under regulations to be prescribed by him, shall act jointly with the Postmaster General in the selection of towns or cities in which buildings are to be constructed and the selection of sites therein: . . . ." [4] These Acts were natural means for Congress to adopt in putting its constitutional powers into use on a scale commensurate with the size of the nation and the need of the time. Neither Act imposed expressly any limitations upon the authority of the officials designated by Congress to exercise its power of condemnation in procuring sites for public buildings deemed necessary by such officials to enable the Government to perform certain specified functions.[5] Far removed from the time and circumstances that led to the enactment of these statutes in 1888 and 1926, this Court must be slow to read into them today unexpressed limitations restricting the authority of the very officials named in the Acts as the ones upon whom Congress chose to rely.

The power of eminent domain is essential to a sovereign government. If the United States has determined its need for certain land for a public use that is within its federal sovereign powers, it must have the right to appropriate that land. Otherwise, the owner of the land, by refusing to sell it or by consenting to do so only at an unreasonably high price, is enabled to subordinate the constitutional powers of Congress to his personal will. The Fifth Amendment, in turn, provides him with important

---

[4] For the three foregoing quotations, see note 1, *supra*.

[5] Nothing has been found in the legislative history of these Acts to indicate that Congress intended to give its agents less than the fullest possible authority of Congress in selecting cities and sites. See H. R. Rep. No. 132, 69th Cong., 1st Sess., especially minority views at pp. 6–7, 10, and H. R. Rep. No. 1223, 69th Cong., 1st Sess.; S. Rep. No. 197, 69th Cong., 1st Sess.; 67 Cong. Rec. 4023–4028, 8356–8357, 8359, 8494, 8567.

protection against abuse of the power of eminent domain by the Federal Government.[6]

While in its early days the Federal Government filed its condemnation cases in the state courts, this Court, in *Kohl* v. *United States,* 91 U. S. 367, disposed of the idea that this was necessary. In that case, which has become the leading case on the federal power of eminent domain, Mr. Justice Strong also said:

> "It has not been seriously contended during the argument that the United States government is without power to appropriate lands or other property within the States for its own uses, and to enable it to perform its proper functions. Such an authority is essential to its independent existence and perpetuity. These cannot be preserved if the obstinacy of a private person, *or if any other authority, can prevent the acquisition of the means or instruments by which alone governmental functions can be performed.* The powers vested by the Constitution in the general government demand for their exercise the acquisition of lands in all the States. These are needed for forts, armories, and arsenals, for navy-yards and lighthouses, for custom-houses, post-offices, and court-houses, and for other public uses. If the right to acquire property for such uses may be made a barren right by the unwillingness of property-holders to sell, *or by the action of a State prohibiting a sale to the Federal government, the constitutional grants of power may be rendered nugatory, and the government is dependent for its practical existence upon the will of a State, or even upon that of a private citizen. This cannot be.* No one doubts the existence in the State governments of the right of eminent domain,—a

---

[6] "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U. S. Const., Amend. V.

right distinct from and paramount to the right of ultimate ownership. It grows out of the necessities of their being, not out of the tenure by which lands are held. It may be exercised, though the lands are not held by grant from the government, either mediately or immediately, and independent of the consideration whether they would escheat to the government in case of a failure of heirs. The right is the offspring of political necessity; and it is inseparable from sovereignty, unless denied to it by its fundamental law. . . . But *it is no more necessary for the exercise of the powers of a State government than it is for the exercise of the conceded powers of the Federal government. That government is as sovereign within its sphere as the States are within theirs. True, its sphere is limited. Certain subjects only are committed to it; but its power over those subjects is as full and complete as is the power of the States over the subjects to which their sovereignty extends. . . .*

.     .     .     .     .

*"If the United States have the power, it must be complete in itself. It can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised. The consent of a State can never be a condition precedent to its enjoyment."* (Italics supplied.) *Kohl* v. *United States, supra,* 371–372, 374.

The *Kohl* case approved the condemnation of privately owned land, then subject to a perpetual leasehold, for a post office site in Cincinnati, Ohio, under an Act of Congress expressly naming that City but not expressly naming the site. The respondent here seeks, by judicial interpretation of the general Condemnation Act and the Public Buildings Act, to exclude from condemnation a particular site in Cape Girardeau selected for a post office by the appropriate federal officials. She depends upon the fact

that the site already is being used by a governmental subdivision of Missouri for other public purposes impressed upon it by its private owners over a century ago. The principle of federal supremacy, so well expressed in the *Kohl* case, argues against such a subordination of the decisions of federal representatives to those of individual grantors or local officials as to the means of carrying out an admittedly federal governmental function.[7]

It makes little difference that the site here sought to be condemned is held by the City in trust instead of in fee. The city government is not resisting the condemnation. The Federal Government can obtain, by voluntary conveyance, whatever title the City can convey. The weakness in the City's right to sell or exchange this site arises from restrictions in the conveyance to it. Through the inclusion, as defendants, of all claimants who might rely upon such restrictions or might claim an interest through the grantors of this site, a decree of condemnation will dispose of the suggested defects. By giving notice to all claimants to a disputed title, condemnation proceedings provide a judicial process for securing better title against all the world than may be obtained by voluntary conveyance.

Both in themselves and from the relation of these Acts to the Constitution, we find substantial reason for making their broad language effective to its full constitutional limit. While the federal power of eminent domain is limited to taking property for federal public uses, the question of the existence of a federal public use presents no difficulty here because the constitutional power of Congress to establish post offices is express.[8]

---

[7] See also, *Hanson Co.* v. *United States,* 261 U. S. 581, 587, for emphasis on the all-inclusiveness of the general Condemnation Act of August 1, 1888.

[8] U. S. Const., Art. I, § 8, Cls. 7 and 18.

The considerations that made it appropriate for the Constitution to declare that the Constitution of the United States, and the laws of the United States made in pursuance thereof, shall be the supreme law of the land [9] make it appropriate to recognize that the power of eminent domain, when exercised by Congress within its constitutional powers, is equally supreme. Mr. Justice Bradley stated this principle clearly, while on circuit, in *Stockton v. Baltimore & N. Y. R. Co., 32 F. 9, 19*:

> "The argument based upon the doctrine that the states have the eminent domain or highest dominion in the lands comprised within their limits, and that the United States have no dominion in such lands, cannot avail to frustrate the supremacy given by the constitution to the government of the United States in all matters within the scope of its sovereignty. This is not a matter of words, but of things. If it is necessary that the United States government should have an eminent domain still higher than that of the state, in order that it may fully carry out the objects and purposes of the constitution, then it has it. Whatever may be the necessities or conclusions of theoretical law as to eminent domain or anything else, it must be received as a postulate of the constitution that the government of the United States is invested with full and complete power to execute and carry out its purposes." [10]

---

[9] U. S. Const., Art. VI.

[10] An appeal in *Stockton v. Baltimore & N. Y. R. Co., supra,* was dismissed in this Court, 140 U. S. 699, and, in the meantime, Mr. Justice Bradley's statement was quoted with approval in *Cherokee Nation v. Kansas Ry. Co.,* 135 U. S. 641, 656. See also, *United States v. Gettysburg Electric Ry.,* 160 U. S. 668, 681; *Luxton v. North River Bridge Co.,* 153 U. S. 525, 529–530.

When Congress has wished to subordinate its selection of state lands to state approval it has done so by express provision. In the Weeks

The Fifth Amendment to the Constitution says "nor shall private property be taken for public use, without just compensation." This is a tacit recognition of a preexisting power to take private property for public use, rather

Forestry Act of March 1, 1911, 36 Stat. 961, 962; 43 Stat. 1215; 45 Stat. 1010; 48 Stat. 955; 16 U. S. C. § 516, and the Migratory Bird Conservation Act of February 18, 1929, 45 Stat. 1222, 1223; 16 U. S. C. § 715f, the consent of the state legislature to the federal acquisition of land is made an express condition of the acceptance of such land. Such consent does not deprive the state of civil or criminal jurisdiction over the land. 36 Stat. 963, 16 U. S. C. § 480, and 45 Stat. 1224, 16 U. S. C. § 715g. See also, The Upper Mississippi River Wild Life and Fish Refuge Act of June 7, 1924, 43 Stat. 650, 16 U. S. C. § 724.

The acquisition of federal legislative jurisdiction, as distinguished from federal title to the land, is a different matter. If the Federal Government desires exclusive legislative jurisdiction over land acquired by it, the Constitution indicates that the consent of the state in which the land is located is necessary. Art. I, § 8, Cl. 17, provides that "The Congress shall have Power . . . To exercise exclusive Legislation . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; . . . ." See *Stockton* v. *Baltimore & N. Y. R. Co.*, 32 F. 9, 18, appeal dismissed, 140 U. S. 699. See also, Joint Resolution of September 11, 1841, 5 Stat. 468, and Rev. Stat. § 355, which formerly required the consent of state legislatures to federal purchases of certain sites as a condition of expending federal funds to pay for them. Since February 1, 1940, such consent has not been required except where the United States has sought "exclusive or partial" legislative jurisdiction. Unless and until the United States accepts such jurisdiction over lands acquired since February 1, 1940, it is presumed conclusively that no such jurisdiction has been accepted. 54 Stat. 19; 54 Stat. 1083; 40 U. S. C. § 255. The exercise of exclusive legislative jurisdiction is not an issue in this case and, in any event, Missouri has consented to it. "The consent of the State of Missouri is hereby given in accordance with the seventeenth clause, eighth section of the first article of the Constitution of the United States to the acquisition by the United States by purchase or grant of any land in this State which has been or may hereafter be acquired, for the purpose of establishing and maintaining postoffices, . . . ." Mo. Rev. Stat. Ann. (1939), § 12691.

than a grant of new power.[11]   It imposes on the Federal Government the obligation to pay just compensation when it takes another's property for public use in accordance with the federal sovereign power to appropriate it.   Accordingly, when the Federal Government thus takes for a federal public use the independently held and controlled property of a state or of a local subdivision, the Federal Government recognizes its obligation to pay just compensation for it and it is conceded in this case that the Federal Government must pay just compensation for the land condemned.[12]

The foregoing establishes the principle of the supremacy of a federal public use over all other uses in a clearly designated field such as that of establishing post offices. The Government here contends that the officials designated by Congress have been authorized by Congress to use their best judgment in selecting post office sites.   It contends also that if the officials so designated have used such judgment, in good faith, in selecting the proposed park site in spite of its conflicting local public uses, the Federal Works Administrator has express authority to direct the condemnation of that site.   We agree with those contentions.   We find in the broad terms of the Public Buildings Act authority for the designated officials to select the site they did.   We find, in both Acts, authority for them to acquire by condemnation the site thus lawfully selected. The judgment exercised by the designated officials in se-

---

[11] See *United States* v. *Cooper,* 20 D. C. 104, 116, affirmed *sub nom., Shoemaker* v. *United States,* 147 U. S. 282; *In re Rugheimer,* 36 F. 369, 371.

[12] When, however, a sovereign state transfers its own public property from one governmental use to another, or when the Federal Government takes property from state ownership merely so as to put it to a federal public use for which the state already holds it in trust, a like obligation does not arise to pay just compensation for it.   See *In re Certain Land in Lawrence,* 119 F. 453; *Stockton* v. *Baltimore & N. Y. R. Co.,* 32 F. 9, 19, appeal dismissed, 140 U. S. 699.

lecting this site out of 22 sites suggested, and out of two closely balanced alternatives, constituted an administrative and legislative decision not subject to judicial review on its merits. It was within the legislative power of Congress to choose or reject this site by direct action. It would have been within its legislative power to exclude from the consideration of its representatives this or other sites, the selection of which might interfere with local governmental functions. Such an exclusion would have been an act of legislative policy. We find no such express or necessarily implied exclusion in the broad language of these Acts.[13]

In this case, it is unnecessary to determine whether or not this selection could have been set aside by the courts as unauthorized by Congress if the designated officials had acted in bad faith or so "capriciously and arbitrarily" that their action was without adequate determining principle or was unreasoned.[14] The record presents no such issue

---

[13] In the instant case, we deal with broad language employed to authorize officials to exercise the sovereign's power of eminent domain on behalf of the sovereign itself. This is a general authorization which carries with it the sovereign's full powers except such as are excluded expressly or by necessary implication. A distinction exists, however, in the case of statutes which grant to others, such as public utilities, a right to exercise the power of eminent domain on behalf of themselves. These are, in their very nature, grants of limited powers. They do not include sovereign powers greater than those expressed or necessarily implied, especially against others exercising equal or greater public powers. In such cases the absence of an express grant of superiority over conflicting public uses reflects an absence of such superiority. See *United States* v. *Jotham Bixby Co.,* 55 F. 2d 317, 319, affirmed *sub nom., C. M. Patten & Co.* v. *United States,* 61 F. 2d 970, decree vacated as moot, 289 U. S. 705; *In re Condemnations for Improvement of Rouge River,* 266 F. 105; *United States* v. *City of Tiffin,* 190 F. 279, 281.

[14] "Arbitrary" is defined by Funk & Wagnalls New Standard Dictionary of the English Language (1944), as "1. . . .; without adequate determining principle; . . ." and by Webster's New International

here.  The procedure followed in making the selection of the site showed extraordinary effort to arrive at a fair and reasoned conclusion.[15]  The site inspector, in his original

Dictionary, 2d Ed. (1945), as "2. Fixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance, . . . decisive but unreasoned; . . . ."

"Capricious" is defined by Webster's New International Dictionary, 2d Ed. (1945), as "2. . . .; apt to change suddenly; freakish; whimsical; humorsome."  Cf. *Fox Film Corp.* v. *Trumbull,* 7 F. 2d 715, 727; *Puget Sound Power & L. Co.* v. *Public Utility Dist. No. 1,* 123 F. 2d 286, 290, cert. denied, 315 U. S. 814; *United States* v. *Eighty Acres of Land,* 26 F. Supp. 315, 319.

See also, *United States* v. *Certain Parcels of Land,* 30 F. Supp. 372, 379; *United States* v. *Parcel of Land,* 32 F. Supp. 718, 721.

[15] It apparently followed regulations of the Federal Works Agency and Post Office Department as authorized by 5 U. S. C. §§ 22, 369; 40 U. S. C. §§ 341, 347.  Among its principal steps were the following: June 12, 1940, approval of the general project for Cape Girardeau by Federal Works Administrator and Acting Postmaster General based upon the recommendation of the Commissioner of Public Buildings and the Fourth Assistant Postmaster General; July 23–26, 29–31, 1940, Post Office Inspector and Site Agent visited Cape Girardeau; August 20, 1940, he submitted his recommendations, showing that he inspected 22 proposals, eliminated all but 6 on general grounds, carefully considered the remainder and submitted full report on 3.  His first choice was to enlarge the present post office site; his second, to acquire the site here in controversy; his third, to acquire a site between the two. Further studies were made in Cape Girardeau or in Washington by the Associate Architect for the Federal Works Agency, the Fiscal Manager of the Public Buildings Administration and the Superintendent of the Division of Post Office Quarters in the Post Office Department.  All wishing to be heard were heard.  February 11, 1941, the City Council passed an ordinance proposing an exchange of the park site for the present post office site and submitting this proposal to a special election.  March 4, 1941, a majority of those voting in 8 of the 10 wards approved the exchange, the city-wide vote being 1612 to 1344.  May 26, 1941, the Acting Commissioner of Public Buildings notified the Mayor of the Government's acceptance of the proposed exchange. September 25, 1941, the Acting Administrator of the Federal Works Agency advised the Attorney General that, under authority of the Pub-

report, recommended the park site as his second choice and demonstrated the reasonableness of a choice, by his superiors, of either of his first two selections.[16] His esti-

lic Buildings Act, the Agency had contracted for the exchange. After referring to his failure to secure title by voluntary conveyance from the City in spite of the willingness of the City officials to make the exchange if they had legal authority to do so, he asked the Attorney General to file this condemnation proceeding. It was done November 22, 1941. In accordance with the opinion of the Circuit Court of Appeals after the first trial, the Government, on June 10, 1943, secured evidence of a formal joint action, signed personally by the Federal Works Administrator and the Postmaster General, expressly selecting the site in suit. This was included in the record of the second trial. The actions of June 12, 1940, and June 10, 1943, refer to the project as one for a post office and courthouse, whereas the petition for condemnation refers to it as one for a post office and customhouse. This variation was not pressed in the litigation and is not material to the main issue of statutory construction.

The foregoing narration of the steps taken in this instance is not intended as an indication that all or any of them are essential to the exercise of the statutory authority to select sites in other cases. They are set forth to help demonstrate that, in the face of them, the selection here cannot be classed as "capricious and arbitrary," under any appropriate definition of those words.

[16] "For First Choice I recommend that the present government-owned site be retained and that the adjoining property, Site 2 offered by H. Bermermann be purchased for $15,000, and that a counter offer be made to the owner of Site 3, Ella M. Drum to purchase this site for $600.

"This recommendation is made because it is believed that the present location is the most outstanding site in this city, and because of the numerous limitations on all of the other competing sites which would prevent an advantageous or desirable transaction.

"For Second Choice I have selected Site No. 1, the city-owned park, which could be developed into an attractive setting for the new building, and which could no doubt be secured in an exchange resulting in mutual benefit to the city and Government. The bid submitted by the City is not intended to be a final offer, and it is expected that after a review of the facts by the Site Committee a counter-offer could be made with respect to a definite area of about 175' x 215' within the park grounds and with respect to improvements in surrounding

mate of divided community sentiment, with apparent community preference for the park site, indicates the absence of capriciousness and arbitrariness in the Government's final selection of the park site.[17] The popular referendum vote of 1612 to 1344 in favor of the transfer of the park site by the City to the Federal Government, in exchange for the Government's transfer of its present post office site to the City, confirms his estimate. These federal officials had the right, if not the obligation, to consider at this time the necessity of disposing of the present post office site and of the single-purpose governmental building thereon. That issue inevitably would confront the Government at some time if a new site were chosen. The opportunity to exchange or sell the present site to the City in connection with the acquisition of the park site for a new post office was, therefore, a reasonable rather than a capricious consideration.

---

approaches, removal of trees and fountain, and demolition of present city building. The mayor and city council verbally agreed to favor any reasonable counter-offer to be made by the Government. It is my opinion that the government-owned site is valued at approximately $225 per front foot, whereas the park site has a value of about $100 per front foot, and this must be taken into consideration in submitting a counter-offer. The question of the City Council's authority to make an exchange of this property is in dispute, but this could no doubt be settled by friendly condemnation proceedings, as the city officials are willing and desirous for the trade."

[17] ". . . the city park property, is actively favored by the City Council, and almost unanimously favored by the business men on Main Street. . . .

"Because of the divergence of opinion, the Chamber of Commerce in a recent meeting decided not to make any official comment as to a certain location. . . .

"The postmaster, who has no financial or personal interest in any of the locations, but who is conscientiously interested in civic development, regards the government-owned site as an outstanding location but recommends the city park as first choice because this trade would allow the city to retain a good improvement and allow the Federal Government to secure a site with attractive surroundings."

On the present record, the petitioner was entitled to a preliminary judgment of condemnation. The finding of the District Court on the second trial that the selection of the park site "amounts in law to an arbitrary and unnecessary act" appears, from the context, to have been a finding largely of the comparative undesirability and lack of necessity for the selection of that site and not to have been a finding that the selection had been made without adequate determining principle and without reason.[18] The comparative desirability and necessity for the site were matters for legislative or administrative determination rather than for a judicial finding.[19] Even if the word

---

[18] The District Court said:

"The right of plaintiff to condemn the land must stand or fall on the determination by this court of the question, Did the Acting Administrator of Federal Works Agency and the Postmaster General, under the circumstances here presented, act arbitrarily and capriciously in selecting the site—*was the act necessary?* The term 'arbitrarily and capriciously' has been defined to mean an act done 'without adequate determining principle; not founded in the nature of things; not done or acting according to reason or judgment'; *an unnecessary act.* . . . .

.         .         .         .         .

"That this action was taken by the Joint Committee, with information in their possession with respect to availability of other sites which shows unquestionably that the action of the plaintiff is *unnecessary and the site selected is not now, nor was it when selected, the most desirable and available.*" (Italics supplied.) *United States* v. *Certain Land, Etc.,* 55 F. Supp. 555, 557, 563.

[19] *United States ex rel. T. V. A.* v. *Welch,* 327 U. S. 546; *Rindge Co.* v. *Los Angeles,* 262 U. S. 700, 708–710; *Joslin Co.* v. *Providence,* 262 U. S. 668, 678; *Bragg* v. *Weaver,* 251 U. S. 57, 58; *Sears* v. *City of Akron,* 246 U. S. 242, 251; *Adirondack Ry.* v. *New York State,* 176 U. S. 335, 349; *Shoemaker* v. *United States,* 147 U. S. 282, 298; *Boom Co.* v. *Patterson,* 98 U. S. 403, 406. See also: "The federal statute . . . does not require proof of 'necessity,' but makes that question depend solely on the 'opinion' of the federal officer. It is controlling here." *United States* v. *Montana,* 134 F. 2d 194, 197, cert. denied, 319 U. S. 772.

"arbitrary," as used by the District Court, was intended by it to have the ordinary meaning which that word has when used alone, we are unable to conclude on the record before us that the selection of the park site for a post office in Cape Girardeau was, as a matter of law, capricious and arbitrary in any sense that, under any construction of the Acts before us, would invalidate the selection here made.

The judgment of the Circuit Court of Appeals, therefore, is reversed and the cause remanded to the District Court for further proceedings consistent with this opinion.

*Reversed.*

MR. JUSTICE DOUGLAS concurs in the result and substantially agrees with the opinion of the Court. But he reserves judgment as to the circumstances under which authority to condemn land owned by a city or a state should be inferred from a general condemnation statute, if the local government challenged the taking.