**UNITED STATES of America,**
**Petitioner,**

v.

**CERTAIN PARCELS OF LAND IN PE-**
**ORIA COUNTY, ILLINOIS, Pleasure**
**Driveway and Park District of Peoria,**
**Illinois, et al., and Unknown Owners,**
**Defendants.**

**Civ. A. No. P-2530.**

United States District Court
S. D. Illinois, N. D.

Oct. 15, 1962.

484

Edward R. Phelps, U. S. Atty., Springfield, Ill., for petitioner.

William McD. Frederick, John E. Cassidy, Jr., Cassidy & Cassidy, Peoria, Ill., for defendants.

MERCER, Chief Judge.

Plaintiff, the United States of America, filed this suit under the eminent domain provisions of the Federal Aid Highway Act, the General Condemnation Act and the so-called federal "quick take" statute,[1] for the condemnation of certain lands in Peoria County, Illinois, for highway purposes.

The defendant owner of the land, Pleasure Driveway and Park District of Peoria, Illinois, answered the complaint averring that the land in suit is devoted to a public use as a part of Bradley Park in Peoria, Illinois, and that plaintiff has no authority under the provisions of Section 107(a) of the Federal Aid Highway Act to condemn the property for highway purposes. Because defendant's answer partakes of the character of a motion for summary judgment, and because the whole cause would fail if defendant's theory as to the legal effect of the undisputed facts should prevail, this court on June 8, 1962, entered an order restraining enforcement of a quick-take order for possession of the land, entered May 24, 1962, until the further order of the court.

Since the facts are not disputed, a hearing was held July 6, 1962, upon defendant's answer, treated as a motion for summary judgment, at which time the parties were directed to submit briefs to the court. Those briefs have now been received and the cause is under advisement.

The undisputed facts follow: The Federal Aid Highway Act, 23 U.S.C.A. § 101 et seq., inter alia, authorizes the construction of a national system of interstate and defense highways. The several states participating in its program are charged with the responsibility, within each its respective borders, for the routing, planning, right-of-way acquisition and construction of the interstate highways, subject to the prior approval of the Secretary of Commerce of routes, plans and construction projects.

The General Assembly of Illinois has adopted legislation for that State's participation in the Federal Aid Highway program,[2] and therein designated the

1. 23 U.S.C.A. § 107(a), 40 U.S.C.A. § 257 and 40 U.S.C.A. § 258a, respectively.

2. Ill.Rev.Stat.1961, c. 121, Sec. 3–101 et seq.
   "The General Assembly, constituting the Legislature of the State of Illinois,
   assents to the provision, terms, conditions and purposes of the Federal Aid Road Act as defined in this Code.
   "In the location of highways which will be a part of the National System of Interstate and Defense Highways * * *

Illinois Department of Public Works & Buildings, hereinafter the Department, as the agency to guide the participation of that State in the program. Among the interstate construction projects planned by the Department, and approved by the Secretary of Commerce, is a highway traversing the State in a northwesterly-southeasterly direction, which is designated as Federal Aid Interstate Route 74, hereinafter called FAI 74. The route selected by the Department for the right-of-way of FAI 74, and approved by the Secretary of Commerce, encompasses the land in suit, namely, 12.127 acres of land located in the northeast corner of Bradley Park.

On January 5, 1962, the Department filed a suit in the Circuit Court of Peoria County for the condemnation of that land as a right-of-way for FAI 74. The Department's complaint was dismissed by the Circuit Court, apparently, in reliance upon the decision in Dept. of Public Works & Buildings v. Ells, 23 Ill. 2d 619, 179 N.E.2d 679.

In the Ells case, the Supreme Court of Illinois stated the established principle of Illinois law that a general grant of eminent domain power to the Department does not authorize the condemnation of property already devoted to a public use,[3] and held that the Department had no authority to condemn school district property for highway purposes.

■ The Department did not appeal the decision of the Circuit Court. Instead, it requested the Secretary of Commerce to acquire the land in suit pursuant to the provisions of 23 U.S.C.A. § 107(a).[4] Pursuant to that request, this suit was filed by the United States.

The issue before the court is raised by defendant's second affirmative defense. Thus defendant avers that the Department has not been given specific authority by the Illinois General Assembly to request that the United States condemn this municipally owned and publicly used land for highway purposes; that the Department, lacking legislative authority to

existing highways of the State highway system * * * shall be used to the extent as the Department finds such use is practicable, suitable and feasible. The selection of such locations shall be made as provided in Section 3–103 of this Code." Sec. 3–101.

Section 3–103 provides in part:

"The Department is authorized and instructed to enter into all agreements with the designated authority of the United States Government relating to the selection, construction and maintenance of highways under the provisions of the Federal Aid Road Act, to submit such scheme or project of selection, construction and maintenance as may be required by the designated authority of the United States Government, and to do all things necessary fully to carry out and make effective the cooperation contemplated and provided for by such Act."

3. Illinois C. R. Co. v. Chicago, B. & N. R. Co., 122 Ill. 473, 13 N.E. 140; City of Edwardsville v. County of Madison, 251 Ill. 265, 96 N.E. 238, 37 L.R.A.,N.S., 101; City of Moline v. Greene, 252 Ill. 475, 96 N.E. 911, 37 L.R.A.,N.S., 104.

4. That Section provides, in pertinent part: "In any case in which the Secretary is requested by a State to acquire lands or

interests in lands (including within the term 'interests in lands', the control of access thereto from adjoining lands) required by such State for right-of-way or other purposes in connection with the prosecution of any project for the construction, reconstruction, or improvement of any section of the Interstate System, the Secretary is authorized, in the name of the United States and prior to the approval of title by the Attorney General, to acquire, enter upon, and take possession of such lands or interests in lands by purchase, donation, condemnation, or otherwise in accordance with the laws of the United States (including the Act of February 26, 1931, 46 Stat. 1421), if—

"(1) the Secretary has determined either that the State is unable to acquire necessary lands or interests in lands, or is unable to acquire such lands or interests in lands with sufficient promptness; * * *." 23 U.S.C.A. § 107(a).

Defendant's contention by its answer that the complaint is technically defective because it does not allege a request by the State is considered waived because of defendant's concession elsewhere in the answer and in its briefs and argument that this suit followed a request made by the Illinois Department of Public Works and Buildings.

condemn this land in the name of the State, is subject to the same infirmity in its authority imposed by Illinois law in the matter of requesting federal condemnation; that the power of the United States to take the land in suit is conditioned upon a valid request by the State of Illinois; and that the eminent domain power of the United States can be invoked in the premises only by an act of the State's General Assembly.

Thus, the decisive issue before the court is the question whether the United States has the power to condemn the land in suit upon a request by the Department in view of the decision in the Ells case that the Department, as a matter of State law, has no authority to condemn for highway purposes municipally owned land which is already devoted to a public use, and in view of the provision of Section 107(a) of the Federal Act requiring a request by the State before the Secretary of Commerce may invoke the federal power of eminent domain.

■ Defendant would seemingly have the court approach this issue from the starting point of the limitation of State law upon the authority of the Department to take the land in suit. I reject that as the starting point. Defendant does not contend that the Federal Act is not a valid exercise by Congress of its constitutional powers. The Act, being a valid exercise of federal power, is the supreme law of the land which cannot be limited by conflicting provisions of State law. United States v. Carmack, 329 U.S. 230, 242, 67 S.Ct. 252, 91 L.Ed. 209. In short then, we deal with a question of the federal power of eminent domain, uninfluenced by the limitations imposed upon the Illinois Department by the laws of that State if the power of the United States is properly invoked under Section 107(a) of the Act.

The scope of that federal power is spelled out in United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209. Carmack was a suit to condemn lands held in trust by a city and devoted to public use as a park, a library, a city hall and a courthouse, for the purpose of constructing thereon a post office and custom house. The trial court dismissed the petition, United States v. Certain Land, etc., D.C., 55 F.Supp. 555, holding that the selection of the site was arbitrary and an unnecessary act. The Court of Appeals for the Eighth Circuit affirmed, holding that the federal agencies had no power to take that particular parcel of land by condemnation. United States v. Carmack, 8 Cir., 151 F.2d 881. The Supreme Court reversed, holding that the right of eminent domain of the United States is an unlimited power to take whatever property is required to carry out the constitutional purposes and authority of the federal government.[5] Of that power, the Court said:

"* * * These Acts [the General Condemnation Act and the Public Buildings Act of 1926] were natural means for Congress to adopt in putting its constitutional powers into use on a scale commensurate with the size of the nation and the need of the time. Neither Act ·imposed expressly any limitations upon the authority of the officials designated by Congress to exercise its power of condemnation in procuring sites for public buildings deemed necessary by such officials to enable the Government to perform certain specified functions. * * *

"The power of eminent domain is essential to a sovereign government. If the United States has determined its need for certain land for a public use that is within its federal sovereign powers, it must

5. In developing the thesis that the right of eminent domain is inherent in the sovereignty of the United States, the Court observed that the clause of the Fifth Amendment to the Constitution of the United States, "nor shall private property be taken for public use, without just compensation", presupposes an existing power of eminent domain, "rather than a grant of new power" by that clause. United States v. Carmack, 329 U.S. at 241–242, 67 S.Ct. at 257.

have the right to appropriate that land. Otherwise, the owner of the land, by refusing to sell it or by consenting to do so only at an unreasonably high price, is enabled to subordinate the constitutional powers of Congress to his personal will. * * * " 329 U.S. at 236, 67 S.Ct. at 254.

Quoting from Kohl v. United States, 91 U.S. 367, 371–372, 374, 23 L.Ed. 449, the Court continued:

" ' * * * [The power of the United States to appropriate lands to enable it to carry out its constitutional purposes] is essential to [the United States] independent existence and perpetuity. These cannot be preserved if the obstinancy of a private person, *or if any other authority, can prevent the acquisition of the means or instruments by which alone governmental functions can be performed.* The powers vested by the Constitution in the general government demand for their exercise the acquisition of lands in all the States. * * * If the right to acquire property for [uses necessary to the exercise of constitutional federal powers] may be made a barren right by the unwillingness of property-holders to sell, *or by the action of a State prohibiting a sale to the Federal government, the constitutional grants of powers may be rendered nugatory, and the government is dependent for its practical existence upon the will of a State, or even upon that of a private citizen. This cannot be.* * * * The right [of eminent domain] is the offspring of political necessity; and it is inseparable from sovereignty, unless denied to [a sovereign] by its fundamental law. * * * [The States possess a universally recognized right of eminent domain which] *is no more necessary for the exercise of the powers of a State government than it is for the exercise of the conceded powers of the Federal government. That govern-*

*ment is as sovereign within its sphere as the States are within theirs.* * * * *Certain subjects only are committed to it; but its power over those subjects is as full and complete as is the power of the States over the subjects to which their sovereignty extends.*

* * * * * *

" ' *If the United States have the power [of eminent domain], it must be complete in itself. It can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised. The consent of a State can never be a condition precedent to its enjoyment.' "* (Italics by the Court). 329 U.S. 237–238, 67 S.Ct. at 255.

Again the Court said, quoting Mr. Justice Bradley in Stockton v. Baltimore & N. Y. R. Co., C.C.N.J., 32 F. 9, 19, appeal dismissed, 140 U.S. 699, 11 S.Ct. 1028, 35 L.Ed. 603:

" '[The states' dominion over lands within their borders], cannot avail to frustrate the supremacy given by the constitution to the government of the United States in all matters within the scope of its sovereignty. This is not a matter of words, but of things. *If it is necessary that the United States government should have an eminent domain still higher than that of the state, in order that it may fully carry out the objects and purposes of the constitution, then it has it.* Whatever may be the necessities or conclusions of theoretical law as to eminent domain or anything else, it must be received as a postulate of the constitution that the government of the United States is invested with full and complete power to execute and carry out its purposes.' " 329 U.S. at 240, 67 S.Ct. at 256. (Italics supplied).

█ Since Carmack, there is no basis for doubt that the United States has the power to take lands already devoted to a public use in the exercise of its constitu-

tional powers. What then is the effect upon that power of the provision of Section 107(a) of the Federal Aid Highway Act that the Secretary of Commerce may use the federal power of eminent domain only upon a request "by a State to acquire lands" necessary for the interstate highway system?

The answer to that question must be found in the purpose intended by Congress to be accomplished by the interstate and defense highway system.

Congress declared the policy of the Act as follows:

"It is hereby declared to be in the national interest to accelerate the construction of the Federal-aid highway systems, including the National System of Interstate and Defense Highways, since many of such highways, or portions thereof, are in fact inadequate to meet the needs of local and interstate commerce, for the national and civil defense.

"It is hereby declared that the prompt and early completion of the National System of Interstate and Defense Highways, so named because of its primary importance to the national defense and hereafter referred to as the 'Interstate System', is essential to the national interest and is one of the most important objectives of this Act. It is the intent of Congress that the Interstate System be completed as nearly as practicable over the period of availability of the thirteen years' appropriations authorized for the purpose of expediting its construction, reconstruction, or improvement, inclusive of necessary tunnels and bridges, through the fiscal year ending June 30, 1969, under section 108(b) of the Federal-Aid Highway Act of 1956 (70 Stat. 374), and that the entire System in all States be brought to simultaneous completion. Insofar as possible in consonance with this objective, existing highways located on an interstate route shall be used to the extent that such use is practicable, suitable, and feasible, it being the intent that local needs, to the extent practicable, suitable, and feasible, shall be given equal consideration with the needs of interstate commerce." 23 U.S.C.A. § 101(b).

█ That declaration alone refutes defendant's argument that the Act is merely a grant-in-aid statute, designed to enable Illinois and her sister states to provide suitable highways. The interstate system intended transcends state and local interest in the interest of a larger national purpose of providing a nationwide system of highways adequate to meet the needs of the national defense and interstate commerce. Local needs and intra-state needs are secondary to that larger national purpose.[6] Although the participating States are charged with the primary responsibility of construction of the system, federal supervision is the keystone of the Act. Insofar as it relates to the interstate system, joint action of the several States is required in the matter of highway routing,[7] subject

6. The interstate system is composed of limited access highways, with access points limited to those commensurate with the national purpose. No state may add points of access to, or exit from, any interstate route except upon the prior approval of the Secretary of Commerce. 23 U.S.C.A. § 111.

7. "The Interstate System shall be designated within the United States, including the District of Columbia, and it shall not exceed forty-one thousand miles in total extent. It shall be so located as to connect by routes, as direct as practicable, the principal metropolitan areas, cities, and industrial centers, to serve the national defense and, to the greatest extent possible, to connect at suitable border points with routes of continental importance in the Dominion of Canada and the Republic of Mexico. The routes of this system, to the greatest extent possible, shall be selected by joint action of the State highway departments of each State and the adjoining States, subject to the approval by the Secretary as provided in subsection (e) of this section. * * *" 23 U S C.A. § 103(d).

to the approval of the Secretary of Commerce.[8] All programs of construction proposed by a State must be submitted to the Secretary for prior approval,[9] and the Secretary must give preference to programs which expedite completion of the interstate system [10] and priority to projects recommended by the Secretary of Defense as important to the national defense.[11] All plans, specifications and estimates of construction projects must be submitted for the approval of the Secretary,[12] and these must meet with standards established by the Act.[13] All construction by a State is subject to inspection and approval by the Secretary.[14] The cited areas of federal control are exemplary merely, not an exhaustive summary of the Act.

The Act thus provides for a joint federal-state program, grandiose in scope, for the construction of some 41,000 miles of limited access interstate highways to be completed in a period of thirteen years.[15] Section 107(a) of the Act is an integral part of the legislation adopted by Congress to implement that program. The urgency of the federal purpose is exemplified by its language. Although the Act relates to three separate areas of federal-aid construction, namely, the secondary system, the primary system and the interstate system, the eminent domain provisions of Section 107(a) are restricted to the "Interstate System." The obtaining of rights-of-way for the secondary and primary systems is left exclusively under State control. Thus Congress sought to insure that completion of the interstate system be not thwarted by the inability of the States, "for any reason", to obtain necessary rights-of-way. (Compare the similar grant of condemnation power in the Defense Highway-Aid Act of 1941, 55 Stat. 769.)

In view of that paramount federal purpose reflected in the Act, I reject defendant's contention that the provision of Section 107(a) requiring a request by a State is a conditional limitation upon the federal power of eminent domain. The Act contemplates that implementation of the interstate highway program, including right-of-way acquisition, shall be accomplished by the States to the extent possible. Section 107(a) holds in reserve the federal power of eminent domain for use when "the Secretary has determined either that the State is unable to acquire necessary lands or interests in lands, or is unable to acquire such lands * * * with sufficient promptness." Although the federal power may be invoked only upon a request by a State, the required request is not to be construed ase a limitation upon the power thereby invoked, but merely the means by which exercise of the federal power is invoked in aid of the interstate program. The policy of the Act which is spelled out in Section 101(b) and which is apparent in provisions of the Act which follow that Section, indicates the congressional intent that accomplishment of the construction of the nation-wide system should not be thwarted by the inability of the several states to obtain necessary rights-of-way.[16]

---

8. "The Secretary shall have authority to approve in whole or in part the Federal-aid primary system, the Federal-aid secondary system, and the Interstate System, as and when such systems or portions thereof are designated, or to require modifications or revisions thereof. No Federal-aid system or portion thereof shall be eligible for projects in which Federal funds participate until approved by the Secretary." 23 U.S.C.A. § 103(e).

9. 23 U.S.C.A. § 105(a).

10. 23 U.S.C.A. § 105(c).

11. 23 U.S.C.A. § 105(d).

12. 23 U.S.C.A. § 106.

13. 23 U.S.C.A. § 109.

14. 23 U.S.C.A. § 114.

15. 23 U.S.C.A. §§ 103(d), 101(b).

16. In a situation somewhat analogous to that here presented, it was held that the United States possessed the power under Section 107(a) to condemn lands devoted to use as a cemetery, despite the fact that, under Tennessee law, the State could not condemn the property. United States v. Certain Parcels of Land, E.D. Tenn., 175 F.Supp. 418. Cf., Eden Me-

■ Was the federal power of eminent domain validly invoked in this instance? I hold that it was.

First, it is my opinion that the General Assembly has authorized the Department to make the request which led to this proceeding. It authorized and instructed the Department to enter into all agreements with the United States and to cooperate with the United States in the selection, construction and maintenance of federal aid highways "and to do all things necessary fully to carry out and make effective the cooperation contemplated and provided for by [the Federal Aid Highway Act]".[17] The quoted provision is sufficient authorization for the request made in this case.

Secondly, and, to me, this is the heart of the whole interstate program, the authority of the Department to make the request which invoked the federal power must be inherent in the Illinois statute. The interstate system is essentially a federal project. Had Illinois chosen to not participate in the project, the power of the United States to route FAI 74 over the proposed right-of-way through Illinois and over the land in suit can not be questioned. Illinois did choose to participate. Her General Assembly authorized the Department to implement the construction of highways within her borders as a part of that federal system. The doctrine of supremacy will not permit equivocal participation by a State, which would circumscribe the federal program by limitations imposed by local law. Illinois, having elected to participate in the interstate program, and having designated the Department as the agency authorized to act in her name, may not invoke the laws of the State to deny to her designated agent the authority to do every act necessary to the furtherance of the federal program. Even in the absence of any statutory provision touching the authority of the Department to request the Secretary to condemn the land in suit, such authority must be inferred from the adoption of the federal aid program by the Illinois General Assembly.

■ We deal with an essentially local question whether a few acres of Bradley Park shall be taken from one type of public use for another, but the implication of the decision of that question far transcends the local interest. The federal act contemplates long-range planning as to routes for interstate highways best inclined to meet the national needs of defense and interstate commerce. The Act contemplates that that planning will be implemented by construction programs to be carried into fruition from time to time as appropriations therefor are available. Judicial notice is taken that the system of construction programs has led, in Illinois and in her sister states, to islands of completed construction and of construction in progress interspersed at irregular intervals along the planned interstate routes. Judicial notice is also taken of the fact, notorious in the Peoria Area, that a portion of FAI 74 extending into Peoria and into the vicinity of Bradley Park has been completed and that further construction is now in progress. Only chaos can result if local law or municipal corporations across the nation may block the progress of construction, and prevent the logical and planned extension and connection of those completed projects to achieve the interstate system envis ned by Congress.

This case presents one of the unavoidable areas of conflict of purposes inherent in our federal form of government. As the Court suggests in Carmack, supra, 329 U.S. at 237, 67 S.Ct. 252, either the federal purpose is supreme or the federal sovereignty may be reduced below the minimum allowable limits of sovereign existence. Since here the federal purpose requires the use of a part of Bradley Park, the power to acquire that property transcends the public purpose of retention of the property as a park. I hold that the federal power of eminent domain

morial Park Ass'n v. United States, 9 Cir., 300 F.2d 432.

17. Ill.Rev.Stat.1961, c. 121, Sec. 3–103, note 2, supra.

has been properly invoked in this case, and that that power can not be limited by the law of Illinois which denies to the State the authority to condemn the property in suit.

Chicago Title & Trust Co. v. 4136 West Bldg. Corp., 302 U.S. 120, 58 S.Ct. 125, 82 L.Ed. 147, and City of Davenport v. Three-Fifths of an Acre of Land, S.D.Ill., 147 F.Supp. 794, aff'd 7 Cir., 252 F.2d 354, relied upon by defendant do not impinge upon the suggested decision.

The decision in the Chicago Title case that an Illinois corporation which had been dissolved by the State could not recover its lost corporate existence by a petition for reorganization under Section 77(b) of the Bankruptcy Act, 11 U.S.C.A. § 205(b) has no discernable application to the issue whether an existing department of a state government can invoke the federal power of eminent domain.

The doctrine of implied necessity, applied by this court, in the Davenport case, has no bearing upon the issue now before the court. The distinction between this case and Davenport was there stated, in substance as follows: When the United States, "on its own behalf, seeks to acquire public property by eminent domain, the character of the property sought as public property has no inhibiting influence upon the exercise of the power", but a general delegation of eminent domain power to a municipality or other agent, apart from the sovereign, will not authorize the taking of public property unless the taking is necessary for the accomplishment of the statutory purpose for which the power of eminent domain was delegated. 147 F.Supp. at 800. Here the United States is the moving party and the route of FAI 74 across the land in suit was selected by the agencies authorized by the Act to make that decision. The court has no jurisdiction to inquire whether some other route would serve equally as well so long as there has been a good faith exercise of judgment in the selection of the route. United States v. Carmack, 329 U.S. 230, 242, 67 S.Ct. 252. It is not even· suggested that selection of this route was arbitrary or was attended by bad faith.

An order will be entered denying defendant's motion to dismiss the complaint, vacating the temporary restraining order heretofore entered on June 8, 1962, and reinstating the order of May 24, 1962, for delivery of possession of the property in suit to the United States. Possession of the property shall be delivered by defendant to the Federal Highway Administrator on or before November 1, 1962.