CITY OF PLEASANT RIDGE *v.* GOVERNOR.

DI MATTEO *v.* STATE HIGHWAY COMMISSION.

CITY OF LATHRUP VILLAGE *v.* DEPARTMENT OF
STATE HIGHWAYS.

OPINION OF THE COURT.

1. CONSTITUTIONAL LAW — STATUTES — INTERSTATE HIGHWAYS —
MUNICIPALITIES — STATE CONDEMNATION PROCEEDINGS.

Constitutionality of the State public act, which provides that
approval by the highway location arbitration board of a route
for an interstate highway entitles the State highway depart-
ment to condemn or otherwise acquire property necessary for
successful operation of the proposed highway, cannot be con-
sidered by the Court until the highway department undertakes
to acquire property by condemnation proceedings (PA 1967
[Ex Sess], No 12, § 7).

REFERENCES FOR POINTS IN HEADNOTES

[1]  16 Am Jur 2d, Constitutional Law § 112.
     26 Am Jur 2d, Eminent Domain §§ 168, 169.
[2, 7, 35, 36, 41, 42]  50 Am Jur, Statutes §§ 36–38.
[3, 4]  50 Am Jur, Statutes § 474.
[5]  50 Am Jur, Statutes §§ 170, 195.
[6]  37 Am Jur, Municipal Corporations §§ 77, 102–110.
     39 Am Jur 2d, Highways, Streets and Bridges §§ 72, 202, 204.
[8]  50 Am Jur, Statutes § 39.
[9, 35]  1 Am Jur 2d, Administrative Law §§ 111, 116.
     50 Am Jur, Statutes §§ 36–38.
[10]  16 Am Jur 2d, Constitutional Law §§ 234–239.
     1 Am Jur 2d, Administrative Law § 155.
     39 Am Jur 2d, Highways, Streets and Bridges § 206.
[11]  26 Am Jur 2d, Eminent Domain §§ 45, 169.
[12–15, 17, 18]  26 Am Jur 2d, Eminent Domain § 11.
[16]  26 Am Jur 2d, Eminent Domain § 111.
[18]  26 Am Jur 2d, Eminent Domain §§ 45, 113.
[19, 22, 23, 25, 26]  26 Am Jur 2d, Eminent Domain § 45.
[19–21]  39 Am Jur 2d, Highways, Streets and Bridges § 72.

2. STATUTES—INTERSTATE HIGHWAY ROUTES—FEDERAL AID.

A State public act providing for arbitration of disputes involving the determination of routes for interstate highways through municipalities and authorizing acquisition of property therefor *held,* keyed by express definition and significant references to the Federal act which provides aid to State constructing interstate highways so that the purposes of the Federal act could be carried out in this State and so that financing provided by the Federal act would be available to the State (23 USC § 101 *et seq.;* PA 1967 [Ex Sess], No 12).

3. SAME—SEVERABILITY—INTERSTATE HIGHWAY LOCATION ARBITRATION BOARD—ACQUISITION.

Section of statute, providing for arbitration of disputes involving routes for interstate highways through municipalities, which deemed approval by the highway location arbitration board to be consent to designating the route as an interstate highway and empowering the department of State highways to proceed to acquire necessary property by condemnation or otherwise *held,* severable (CL 1948, § 8.5; PA 1967 [Ex Sess], No 12, § 7).

4. SAME—VALIDITY OF SEVERABLE SECTION.

Validity of severable section of interstate highway location arbitration act empowering the department of State highways to condemn land for an interstate highway location arbitration board approved route is not determined in proceeding not yet involving land acquisition (CL 1948, § 8.5; PA 1967 [Ex Sess], No 12, § 7).

---

REFERENCES FOR POINTS IN HEADNOTES

[24] 39 Am Jur 2d, Highways, Streets and Bridges §§ 200, 201.
[25] 26 Am Jur 2d, Eminent Domain §§ 111–113.
[27] 27 Am Jur 2d, Eminent Domain § 473.
[28] 1 Am Jur 2d, Administrative Law §§ 113, 116, 147.
[29] 26 Am Jur 2d, Eminent Domain § 169.
[30] 26 Am Jur 2d, Eminent Domain §§ 7, 8, 15, 17.
[31] 27 Am Jur 2d, Eminent Domain § 493.
[32] 26 Am Jur 2d, Eminent Domain § 113, 27 Am Jur 2d, Eminent Domain § 493.
[33, 34, 36] 27 Am Jur 2d, Eminent Domain §§ 17, 112, 113.
[35] 1 Am Jur 2d, Administrative Law §§ 111, 116.
[38, 39] 50 Am Jur, Statutes §§ 36–39.
[40] 50 Am Jur, Statutes §§ 36, 37.
[41, 42] 1 Am Jur 2d, Administrative Law §§ 111, 116.
[43] 20 Am Jur 2d, Courts § 204.

5. Same—Constitutional Law—Condemnation—Federal Act—
   Presumed Validity—Michigan Act.

   The Federal statute providing for acquisition by the United
   States of public and private property in furtherance of the
   purpose of the interstate highway system is presumed to be
   constitutionally valid, otherwise the Michigan statute provid-
   ing for acquisition of property to be used in constructing
   interstate highways which is ancillary and subsidiary to the
   Federal statute might not survive a judicial test for viola-
   tion of the Constitution (23 USC § 101 *et seq.*; PA 1967 [Ex
   Sess], No 12, § 7).

6. Constitutional Law—Highways—Interstate Route Deter-
   mination—Deprivation of Local Control.

   Approval by the interstate highway location arbitration board
   of an interstate highway route which is final and binding
   on affected municipalities does not deprive such municipali-
   ties of reasonable control or violate the provisions of the
   Constitution which prohibit the legislature from vacating or
   altering any road, street, or alley, or any public utility from
   using such roads, streets, or alleys, under the jurisdiction of
   any county, township, city, or village, without approval of the
   local governing unit (Const 1963, art 7, §§ 29, 31; PA 1967
   [Ex Sess], No 12).

7. Statutes—Standards—Incorporation by Reference—Constitu-
   tionality.

   An act, standing by itself, which contains no standards within
   constitutional rule, will withstand an argument that the act
   is unconstitutional because of lack of standards where by
   reference the act adopts or brings within its scope the provi-
   sions of a Federal statute which makes the act operative
   and the Federal statute sets forth specific standards (PA 1967
   [Ex Sess], No 12).

8. Same—Incorporation by Reference.

   Reference statutes, statutes which refer to other statutes and
   make them applicable to the subject of the legislation by
   incorporation, are unaffected by the repeal of the earlier
   statute, since the statute referred to is as much a part of
   the later statute as though incorporated at length in the later
   statute.

9. Administrative Law and Procedure—Statutes—Standards—
   Reference to Other Legislation.

   Standards by which an administrative tribunal is appointed and
   directed to act need not be set up in the creating statute

if the standards to guide the acts to be performed can be found in other legislation incorporated by reference.

10. CONSTITUTIONAL LAW—STATUTES—JUDICIAL REVIEW.

It was not unconstitutional for the public act providing for arbitration of routes for interstate highways and acquisition of property therefor to fail to provide for judicial review of determinations made by the highway location arbitration board, where the act did not undertake to prevent judicial review, judicial review having been provided in a provision of the Constitution (Const 1963, art 6, §§ 4, 28; PA 1967 [Ex Sess], No 12).

11. EMINENT DOMAIN—STATUTES—INTERSTATE HIGHWAYS—FEDERAL POWERS—LIMITATION OF POWER.

Federal statute allows the United States to acquire, enter upon, and take possession of lands or interests in lands by purchase, donation, condemnation, or otherwise in accordance with Federal laws when a State requests the United States to acquire lands or interests in lands required by the State for right-of-way or other purpose in connection with the construction, reconstruction, or improvement of the interstate highway system, provided it is determined that the State is unable to acquire the necessary lands or interests in lands with sufficient promptness, and the State has agreed to pay 10% of the costs of acquisition (23 USC § 107).

12. SAME—UNITED STATES—SUPREME POWER.

The United States government is invested with the full and complete power to execute and carry out its purposes; thus, if it is necessary that the United States government have eminent domain higher than that of the State in order to carry out the objectives and purposes of the Constitution, then the United States has the supreme power of eminent domain (US Const, art 6[2]; 23 USC § 107).

13. SAME — CONSTITUTIONAL LAW — UNITED STATES — SUPREMACY CLAUSE.

The operation of the supremacy clause of the Constitution of the United States, so well recognized in the area of interstate commerce, applies equally as well to the specific power of eminent domain as provided by a valid enactment of congress (US Const, art 6[2]; 23 USC § 107).

14. Same—Constitutional Law—Supremacy Clause—Appropriate Recognition of Powers.

Considerations making it appropriate for the Constitution of the United States to declare the Constitution and laws of the United States to be the supreme law of the land make it appropriate to recognize the power of eminent domain as equally supreme when exercised by congress within its constitutional power (US Const, art 6[2]; 23 USC § 107).

15. Same—Federal Power—Constitutional Law—Full and Supreme Power—Subordination to Other Governments.

Considering the Federal right of eminent domain to be less than a full and supreme power would subvert the Constitution of the United States by enabling the constitutional powers of congress to be subordinated to the will of a State or city or even a private citizen (US Const, art 6[2]; 23 USC § 107).

16. Same—Site Selection—Legislative Function.

Selection of a site for which the power of eminent domain will be exercised is a legislative function (23 USC § 107).

17. Same—Federal Power—Power of State.

Federal power of eminent domain is complete and cannot, absent specific statutory limitation in the Federal act, be enlarged or diminished by a State or municipality, nor be conditioned by any State, municipal, local, or private rights (23 USC § 107).

18. Same—Federal Power—Discretion of Secretary of Commerce—Limitations.

Decision to condemn or not to condemn lands or interests in land for interstate highway system is within the sole discretion of the United States secretary of commerce, provided the State involved has requested condemnation by the secretary, is unable to acquire the land or unable to act with sufficient promptness, and has agreed to pay 10% of the cost of acquiring the land (23 USC § 107).

19. Highways — Statutes — Regulations — Federal Government — Interstate Highways — State Highway Department.

Federal regulation allowing the State highway department, if authorized by State law, to make final decisions for the State in all matters relating to contracts and agreements for projects and to take other necessary action on behalf of the State to comply with Federal law and regulations, and the tenor of the Federal act allowing condemnation of lands to

be used for interstate highways, gives the State highway department a role in carrying out the Federal government's plan for interstate highways by permitting the department to certify to the United States secretary of commerce the State's inability to acquire the necessary lands (23 USC §§ 107, 302; PA 1964, No 286, § 7[m]).

20. SAME—CONSTRUCTION—CONSTITUTIONAL LAW.

The State highway department has authority to build roads according to the State Constitution provision which states the legislature may provide for laying out, construction, improvement, and maintenance of highways (Const 1963, art 7, § 16).

21. STATUTES—HIGHWAY CONSTRUCTION—STATE HIGHWAYS DEPARTMENT—FEDERAL ACTS.

State statute implementing the State constitutional provision for building roads, abolished the office of State highway commissioner and his advisory board and transferred their powers, including the power to do anything necessary and proper to comply with the provisions of present and future Federal aid acts, to the State highway department so that the department could function in its Federally designated role and in compliance with Federal statute (23 USC § 107; Const 1963, art 7, § 16; PA 1964, No 286).

22. HIGHWAYS — FEDERAL AID — EMINENT DOMAIN — INTERSTATE HIGHWAYS.

The Federal act providing aid for highway construction relates to 3 separate areas, the secondary system, primary system, and interstate system; however, the eminent domain provision of the act is restricted to the interstate system with the secondary and primary system left exclusively under State control; thus, congress sought to insure completion of the interstate system without being thwarted by inability of the States to obtain necessary rights-of-way (23 USC § 107).

23. SAME — FEDERAL AID — STATE REQUEST — EMINENT DOMAIN — LIMITATION OF POWERS — INTERSTATE HIGHWAYS.

Federal statute providing aid for highway construction requires that a State request the exercise of the Federal power of eminent domain, thus indicating that the implementation of the interstate highway program be accomplished by the States to the extent possible; however, the required request is not to be construed as a limitation upon the power invoked, but merely the means by which Federal power is invoked to aid the interstate program (23 USC § 107).

24. Same—Interstate Highways—Federal Aid—State Highway Department.

The State highway department has had the constitutional and statutory authority to invoke the provisions of the Federal act providing aid for highway construction since the effective date of the State highway department organization act provision that the department could do anything necessary and proper to comply fully with the provisions of present or future Federal aid acts, without the aid of any subsequent statute (Const 1963, art 7, § 16; 23 USC § 107; PA 1964, No 286, § 7[m]; PA 1967 [Ex Sess], No 12).

25. Same — Interstate Highways — Arbitration — Constitutional Law — State Highway Department.

State statute provisions for arbitration of disputes involving determination of routes for interstate highways through municipalities are constitutional; thus, the approval of route location by the highway location arbitration board is binding upon the State highway department and is additional authority for invoking the eminent domain provisions of the Federal act providing aid to States for highway construction (23 USC § 107; PA 1967 [Ex Sess], No 12, §§ 1-6).

26. Same—Interstate—State Highway Commission—Power to Certify Route—Eminent Domain—Legislative Intent.

The State highway commission has authority to certify to the United States secretary of commerce the determined route for an interstate highway and to certify the State's inability to condemn public lands or to act with sufficient promptness and to request implementation of Federal power to acquire lands for the interstate system under the provision of Federal statute (23 USC § 107; PA 1964, No 286).

27. Costs—Public Question—Municipal Corporations—Injunction—Interstate Highways.

No costs are allowed on an appeal by a city from a denial of injunctive relief which was sought to prevent the State from constructing an interstate highway through complainant cities, a public question being involved.

Dissenting Opinion

Adams, J.

28. Statutes—Interstate Highways—Highway Location Arbitration Board—Constitutional Law—Delegation of Power.

*State statute providing for approval by the State highway location arbitration board of a route for an interstate high-*

way fails to provide any standards or guidelines for adjudicatory action by the arbitration board; thus, the act is invalid as an unconstitutional delegation of legislative power which cannot be saved as a reference statute that adopts provisions of Federal law to implement its own operation (23 USC § 101 et seq.; (PA 1967 [Ex Sess], No 12).

29. Same — Interstate Highways — Determination of Routes — Arbitration.

The purpose of the State statute providing for arbitration of disputes involving determination of routes for interstate highways through municipalities has as its key function a means of determining routes for interstate highways within this State where the route proposed by the highway department lies wholly or partly within the boundaries of a city or village and the proposed route has been objected to by municipal authorities, property owners, or others (PA 1967 [Ex Sess], No 12).

30. Eminent Domain—Sovereignty—Constitutional Law—Highway Routes.

Eminent domain is inherent in State sovereignty, but the right of the State to establish routes for public highways is subject to any restriction or limitations found in the State Constitution (PA 1967 [Ex Sess], No 12).

31. Highways—Statutes—Interstate Routes—Arbitration.

State public act provides that disputes related to route location of interstate highways are to be resolved by arbitration, but arbitration as used in this act does not mean a determination between parties by a person or persons agreed upon by the parties, for the governor may select arbitrators if an affected municipality fails within 30 days to select 3 arbitrators from a list submitted by the governor and furnished to him by the American Arbitration Association (PA 1967 [Ex Sess], No 12).

32. Same—Interstate—Highway Location Arbitration Board—Approval of Location.

Interstate highway location arbitration board in determining a route for an interstate highway must convene at the time and place set by the governor, consider submitted maps and information, hear representatives of the department of State highways and affected municipalities and other parties in interest, function in the executive office and make determinations authorized by statute by majority vote, and within 60

*days of convening approve 1 location for the interstate highway which is binding upon the department and affected municipalities (PA 1967 [Ex Sess], No 12).*

33. Same—Interstate—Highway Location Arbitration Board—Route Approval—Consent—Condemnation.

*Approval by the highway location arbitration board of a route for an interstate highway is considered consent to designating the route as an interstate highway, notwithstanding a provision to the contrary in any law, and the department of State highways may proceed forthwith to acquire property, by condemnation or otherwise, deemed necessary to provide for completion and successful operation of the interstate highway and appurtenant facilities (PA 1967 [Ex Sess], No 12).*

34. Same—Interstate—Highway Location Arbitration Board—Route Determination—Quasi-Judicial Character.

*The highway location arbitration board, whether constituted by agreement or by executive appointment, effectuates this State's policy regarding establishment and location of the route of an interstate highway through a city or village where a dispute exists as to desirability of a proposed location, by functioning in a quasi-judicial manner (PA 1967 [Ex Sess], No 12).*

35. Statutes — Interstate Highways — Route Determination — Arbitration — Constitutional Law — Enumeration of Standards.

*The State statute providing for arbitration of disputes involving determination of routes for interstate highways through municipalities does not contain the legally required enumeration of standards within our constitutional rule which can be applied by the highway location arbitration board in arriving at a determination (PA 1967 [Ex Sess], No 12).*

36. Highways—Highway Location Arbitration Board—Ad Hoc Determination.

*Each new highway location arbitration board created to settle a dispute over the location of an interstate highway route is constituted for an ad hoc determination without any semblance of continuity (PA 1967 [Ex Sess], No 12).*

37. Statutes—Incorporation of Another Statute by Reference.

*Adoption by reference of all or part of the provisions of another statute to make them applicable to a current legislative enactment is permissible.*

38. SAME—INCORPORATION OF ANOTHER STATUTE BY REFERENCE—
ADEQUACY.

*Incorporation in a State statute creating interstate highway
location arbitration board of a definition of an interstate
highway as a "highway route on the interstate system as
defined in and designated pursuant to Title 23 of the United
States Code, prior to the effective date of this act" was wholly
inadequate to incorporate any standards or guidelines for the
guidance of the arbiters appointed under the State statute,
where the arbiters had* carte blanche *authority to approve 1
of the locations proposed by the State highway commission or
by the affected municipalities (23 USC § 101 et seq.; PA 1967
[Ex Sess], No 12).*

39. SAME—REFERENCE STATUTES—EFFECTIVE DATE.

*Cutoff date of usable reference in a State act to a Federal act
may not be later than the date the State act became effective
(23 USC § 101 et seq.; PA 1967 [Ex Sess], No 12).*

40. SAME—REFERENCE STATUTES—LIMITATIONS.

*Reference in a State act to the title of a Federal act is a
reference limited to the specific Federal act mentioned in
the State act (23 USC § 101 et seq.; PA 1967 [Ex Sess], No
12).*

41. SAME—INTERSTATE HIGHWAYS—OBJECTIVE OF INTERSTATE HIGH-
WAYS—HIGHWAY LOCATION ARBITRATION BOARD—GUIDELINES.

*"Interstate system," as used in Federal act, means the national
system of interstate and defense highways as described by
the Federal act, and the statement in the Federal act of na-
tional policy and objective, that in the prompt completion of
the system of interstate and defense highways, existing high-
ways on the interstate route should be used to the extent
feasible with equal consideration being given to local needs
and interstate commerce, furnishes no adequate guidelines to
the State highway location arbitration board in determining
interstate routes (23 USC §§ 101[a], 101[b], 103[d]; PA 1967
[Ex Sess], No 12).*

42. SAME—REFERENCE STATUTES—STANDARDS AND GUIDELINES—CON-
STITUTIONAL LAW—UNLAWFUL DELEGATION—LEGISLATIVE POWER.

*Standards and guidelines contained in Federal act which pertain
to plans, design, and specifications for construction of highways
do not provide standards and guidelines for selection of a
route for an interstate highway, and where the State act
providing for arbitration of disputes involving determination*

of routes for interstate highways contains no guidelines of
its own but refers only to one Federal act which contains no
guidelines that could be applied in determining a route loca-
tion for an interstate highway, the State act is unconstitu-
tional as an unlawful delegation of legislative power (23 USC
§§ 101[a], 103[d]; PA 1967 [Ex Sess], No 12).

43. COURTS—PRECEDENT—STANDARDS AND GUIDELINES.

Decision of a foreign State court on a matter involving con-
sideration of State and Federal guidelines is not applicable
to a case before this Court, where the State and Federal acts
involved contain no comparable standards or guidelines (23
USC § 101 et seq.; PA 1967 [Ex Sess], No 12).

See headnotes 11–23, 26.

Appeal from Oakland, Moore (Arthur E.), J., and
from Court of Appeals prior to decision. Submitted
March 4, 1969. (Calendar Nos. 19–21, Docket Nos.
52,046, 52,047, 52,352.) Order issued May 5, 1969.
Opinions filed August 5 and 15, 1969. Applications
for rehearing, filed by plaintiffs City of Lathrup
Village and Di Matteo, denied September 3, 1969.

The City of Pleasant Ridge, Alfred Di Matteo,
and the City of Lathrup Village seek to enjoin the
Governor, State Highway Commission, and other
State officers or persons representing State offices
from constructing an interstate highway through the
municipalities of Pleasant Ridge and Lathrup Vil-
lage. Complaints dismissed. Plaintiffs appeal prior
to decision by the Court of Appeals. Affirmed.

*Everett F. Hayes,* for plaintiff City of Lathrup
Village.

*Patrick J. Foley,* for plaintiff Alfred Di Matteo.

*John S. Slavens,* City Attorney (*John E. S. Scott*
and *Dickinson, Wright, McKean & Cudlip,* of coun-
sel), for plaintiff City of Pleasant Ridge.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Louis J. Caruso* and *John M. Roche,* Assistant Attorneys General, for defendants.

BLACK and T. M. KAVANAGH, JJ. Alleging unconstitutionality of PA 1967 (Ex Sess), No 12, (MCLA 1969 Cum Supp §§ 252.151–252.158, Stat Ann 1969 Cum Supp §§ 9.1095[51]–9.1095[58]), the plaintiffs sought to enjoin construction through the municipalities of Pleasant Ridge and Lathrup Village of planned interstate highway I–696. The circuit court dismissed all 3 complaints with prejudice. Previous delays in carrying out the declaration of policy appearing in the Federal-aid highways act of 1958 (23 USC § 101 *et seq.*) having been considered, we granted bypass of the Court of Appeals February 6, 1969, pursuant to GCR 1963, 852. All 3 causes were consolidated and submitted March 4, 1969. Our judgment of affirmance, reciting that "An opinion or opinions will follow as soon as same have been considered and signed", was entered May 5, 1969.

The generally projected purpose of interstate highway I–696 has been and now is that of joining present interstate highways I–94 and I–75, from east to west, across parts of Macomb and Oakland counties. The route through the mentioned municipalities having been approved under Act 12 by the highway location arbitration board, the sole issue brought up for review is whether that approval and the statutory proceedings leading up to same are valid as against plaintiffs' constitutional attack. A second question, raised by the Court during oral submission (see *Dation* v. *Ford Motor Co.* [1946], 314 Mich 152, 159–161) and subsequently briefed by

the parties appellant and appellee, will be treated in the second division of this opinion.

The foregoing statement of question brought up for review purposely excludes from current consideration any issue that might arise should condemnatory action be taken by the department of State highways under section 7 of Act 12, the reason being that the department has not as yet, in its own claimed right, undertaken to acquire property in either of the two municipalities by condemnation deemed by it "necessary to provide for the completion and successful operation of the interstate highway and appurtenant facilities." Section 7, of which more presently, reads as follows:

"Sec. 7. Approval by the board is deemed to be consent to designating the route as an interstate highway and, notwithstanding any provision to the contrary in any law, the department may forthwith proceed to acquire property, by condemnation or otherwise, deemed by the department to be necessary to provide for the completion and successful operation of the interstate highway and appurtenant facilities."

### 1. The Constitutional Validity of
### PA 1967 (Ex Sess), No 12.

Act 12 is entitled "An act to provide for arbitration of disputes involving the determination of routes for interstate highways through municipalities and to authorize the acquisition of property therefor." By significant references and express definition the act is keyed to and made an effective adjuvant of the Federal-aid highway act of 1958 (Title 23 USC § 101 *et seq.*), in particular section 128, subd (a) of Title 23.[1]

---

[1] When Act 12 was enacted and these I-696 proceedings were instituted, section 128 subd (a) read as follows:
"§ 128. *Public hearings*

Section 1, subd (d) of Act 12 defines an "interstate highway" as meaning "a highway route on the interstate system as defined in and designated pursuant to title 23 of the United States code, prior to the effective date of this act." Other specific definitions, appearing in section 1, demonstrate an unmistakable legislative intent to resolve, by administrative action of a newly-created interstate highway location board, all differences arising with respect to the "route location" of an interstate highway when it is sought to extend such a highway to or through an "affected municipality." The thrust of the act is manifest. It is that of implementing by reference to the cited Federal statute the purposes of and financing afforded only by the latter.

Sections 2 through 6 of the act provide that, after the State highway commission has reviewed pro-

---

"(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic effects of such a location. Any State highway department which submits plans for an interstate system project shall certify to the secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway."

Section 128 subd (a) was amended by public law 90–495, § 24, 82 Stat 828, effective August 23, 1968. It reads, at present:

"(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic *and social* effects of such a location, *its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.* Any State highway department which submits plans for an interstate system project shall certify to the secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway."

posed interstate highway routes and has deemed it
necessary "to resolve disputes concerning the routes
through 1 or more municipalities," the commission
shall institute proceedings designed to provide notice
to and the public hearing of representatives of the
department, of the affected municipalities and of
"such other persons as are parties in interest," all
for the purpose of arriving at a final administrative
determination "of the route" with provision that such
determination when made shall constitute an "ap-
proval" that is "final and binding upon the depart-
ment and the affected municipalities." At this junc-
ture compare the purpose of sections 2 through 6
with the congressional purpose of quoted 23 USC
§ 128, subd (a). It is in this setting, of what is
popularly known as a "reference statute," that we
undertake to decide the important constitutional
questions which the respective plaintiffs have raised
in the circuit court. See discussion of reference
statutes, *post* at p 249 *et seq.*

Section 7 of the act, not thus far called into play
so far as concerns this I-696 project and any litiga-
tion before us, provides per quotation *ante* for ac-
quisition of property deemed requisite to the com-
pletion and operation of the proposed interstate
highway and the facilities thereof. The validity of
that section, which we regard as severable within
CL 1948, § 8.5 (Stat Ann 1969 Rev § 2.216), is not at
present before the Court. No proceedings except
those leading up to section 6 approval have thus far
been instituted. For elaboration, see the second
division of this opinion.

For the purposes of review of the constitutional
questions posed below and argued here, we accept
the statement thereof which the appellant city of
Pleasant Ridge has presented. That statement is
fairly representative of all questions considered in

the original briefs of the parties appellant and has been accepted by the attorney general pursuant to GCR 1963, 814.1.

"1. Does PA 1967 (Ex Sess), No 12 [MCLA §§ 252.151–252.158, Stat Ann 1969 Cum Supp §§ 9.1095(51)–9.1095(58)] violate Const 1963, art 7, §§ 29, 31, in that its effect is to:

"(a) Deprive appellant and other local units of government of the reasonable control of their highways, streets, alleys and public places.

"(b) Vacate or alter roads, streets, alleys and public places under the jurisdiction of appellant and other local units of government.

"(c) Violate the provisions of CLS 1961, § 252.52 (Stat Ann 1958 Rev § 9.1094[2]) and CL 1948, § 213.71 (Stat Ann 1958 Rev § 8.171, subd [i])?

"2. Is PA 1967 (Ex Sess), No 12, which provides for compulsory binding arbitration of disputes over the location of interstate highways, unconstitutional as:

"(a) An illegal and improper delegation of power, or

"(b) An improper delegation of power without setting up adequate standards or guidelines for the exercise of the power granted? * * *

"3. Is PA 1967 (Ex Sess), No 12, unconstitutional in that it fails to provide for a right of appeal, or is it an administrative agency whose decision is appealable pursuant to Const 1963, art 6, § 28?

"4. Is PA 1967 (Ex Sess), No 12, unconstitutional in that it takes away the jurisdiction and control of the State highway commission over all State trunklines, as well as abdicates its responsibility of determining necessity prior to condemnation, in violation of Const 1963, art 5, § 28?

"5. Is PA 1967 (Ex Sess), No 12, unconstitutional in that it denies appellant and its citizens equal protection of the laws and takes the property of appellant and that of its citizens without due process of law in violation of Michigan Const 1963, art 1, § 17,

and Amendment 14 of the Constitution of the United States?"

In view of our determination that Act 12 is but ancillary to the Federal-aid highway act of 1958,[2] it appears definitely — and we therefore find — that the only posed questions of moment appear in stated questions 1, 2, and 3. We refine them to these:

1. Does Act 12 deprive the appellant municipalities of the reasonable control of their highways, streets, alleys, and public places in violation of article 7, § 29?

2. Does Act 12 vacate or alter any road, street, alley, or public place under the jurisdiction of the appellant municipalities in violation of section 31 of the same article?

3. Is Act 12 unconstitutional in that it undertakes to delegate legislative power to an administrative commission without having included therein requisite standards for the exercise of power granted thereby?

4. Is Act 12 unconstitutional in that it fails to provide a right of judicial review of action taken thereunder by the highway location arbitration board?

Our answer to restated questions 1 and 2 is foretold by that which appears above. No proceedings designed to condemn public ways or public property in either of the two municipalities have been commenced by the department of State highways. Whether the department may with constitutional sanction condemn such ways or property is a serious question, sections 29 and 31 of article 7 considered

---

[2] Act 12 spends its whole force in the implementation of Title 23. It deals with no way or highway excepting those coming within the definition of highways constituting, when constructed, a part of the "Interstate System." See 23. USC § 101, subd (a). The route of no intrastate highway, of Michigan, was intended to or could be affected or determined thereby.

in array with quoted section 7 of Act 12.[3] If it were not a fact that the cited Federal statute, of which Act 12 is but subsidiary, provides what we must presume is constitutional authority for acquisition, by the United States, of public as well as private property in furtherance of the purposes of the interstate system (see 23 USC §§ 107, 108), section 7 might fail indeed to survive a judicial test for violation of section 29 and 31, section 31 in particular.

That question need not be decided now, however. We are concerned presently with the validity of proceedings thus far taken under sections 1 through 6 of Act 12, and we find that those proceedings do not violate sections 29 and 31. The reasonable control reserved to the appellant municipalities by section 29 has not been taken from them under or in pursuance of Act 12, and the legislature has not vacated or altered any public way or place therein, in violation of section 31. When and if the department of State highways should undertake to condemn public ways or places, or both, within either municipality, will be the rightful occasion for an article 7 test of its doings. All that has been done thus far, upon authority of Act 12, is that of entry of an "approval" by the board of an interstate highway route or "location" which is "final and binding upon the department and the affected municipalities." That approval as entered doubtless will be forwarded to the secretary of commerce as a part of the department's certificate which quoted 23 USC § 128, subd (a) requires.

---

[3] Our judgment of affirmance, entered May 5, includes this paragraph:

"The Court's opinion will refrain specifically from determining that the department of State highways, distinguished from action requested by Michigan and instituted by the secretary of commerce under Title 23, US Code, is empowered to condemn public property lying within the boundaries of the plaintiff municipalities."

This disposes of restated questions 1 and 2. We come then to the outstanding constitutional question; whether Act 12, devoid as it is of standards or guidelines within the four corners thereof, invalidly delegates legislative power to the highway location board.

Act 12, standing by itself, admittedly contains no standards within our constitutional rule. See *Osius* v. *City of St. Clair Shores* (1956), 344 Mich 693 (58 ALR 2d 1079) and *Homrich* v. *Storrs,* 372 Mich 532. If Act 12 was not what it is, namely a statute which by reference adopts or brings within its scope the provisions of another statute in order that it may become operative, invalidity thereof as charged would be apparent. Act 12 however is such a reference statute,[4] and the Federal statute to which it refers and upon which its operational purpose is dependent sets forth a great plethora of specific standards to which all local functionaries defined in section 1 thereof, the "board," the "department," the "commission" and the "affected municipality," must conform on penalty of no financing and no construction of highway I–696. That is enough to meet and overcome the "no standards" argument which counsel have so forcefully presented.

For express examples of the Federal standards to which Act 12 is geared by referential incorporation, see section 101(b) "definitions and declaration of policy"; section 103(d) "Federal aid systems"; section 106(a) "plans, specifications and estimates"; § 109(a) (b) "standards", and section 315 "rules, regulations and recommendations," all of Title 23, United States Code. And, in connection with section 315 thereof, see Vol. IV "Regulations, Standards,

---

[4] For a general textual discussion of reference statutes, their purposes and generally accepted validity, see 50 Am Jur, Statutes §§ 36, 37, 38 and 215, pp 57, 58, 195, and 196.

and Statements of Policy," appearing in the Code of
Federal Regulations (23 CFR, ch 1, pt 1) as cur-
rently compiled by the department of commerce and
issued by the bureau of public roads.

The principle of statutory adoption or incorpora-
tion by reference is no stranger to Michigan.
Beginning prominently with *People* v. *Malsch* (1898),
119 Mich 112, 115:

> "The law of 1885 refers to the then-existing dis-
> orderly act, instead of repeating the substance of its
> pertinent provisions. By such reference, such act
> became a part of the act of 1885; and it is an estab-
> lished rule that in such a case it is not affected by a
> subsequent repeal of the act referred to. See
> Endlich, Interpretation of Statutes, § 492. We have
> followed this rule in the cases of *Darmstaetter* v.
> *Moloney* (1881), 45 Mich 621, and *Regents of Uni-
> versity of Michigan* v. *Auditor General* (1896), 109
> Mich 134."

and carrying through *Public Schools of the City of
Battle Creek* v. *Kennedy* (1929), 245 Mich 585, 590,
591:

> "In *Darmstaetter* v. *Moloney*, 45 Mich 621, 624, it
> it said:
>
> " 'The rule that a piece of legislation for a
> particular city which adopts under general words of
> reference a specific regulation in a separate general
> law is not to be taken as adopting prospectively the
> future alterations in the provision of the general
> law so appropriated, unless the intent therefor is
> express or strongly implied.' * * *
>
> " 'There is another form of adoption wherein the
> reference is, not to any particular statute or part
> of a statute, but to the law generally which governs
> a particular subject. The reference in such case
> means the law as it exists from time to time, or at
> the time the exigency arises to which the law is to

be applied.' 2 Lewis' Sutherland Statutory Construction (2d ed), § 405.

"In *Cole* v. *Wayne Circuit Judge* (1895), 106 Mich 692, it is said:

"'Section 8307 [2 How Stat] does not limit the procedure upon appeal to the provisions of the justices' act as they then existed. It provided by general reference to another law, and is intended to furnish, a rule for future conduct, "always to be found, when it is needed, by reference to the law existing at the time when the rule is invoked." Endlich, Interpretation of Statutes, § 493; *Kugler's Appeal* (1867), 55 Pa St 123.'",

the principle was adhered to most recently in *Haveman* v. *Kent County Road Commissioners* (1959), 356 Mich 11, 18:

"It is an established rule that when one statute adopts by reference a definition in a former statute such definition becomes a part of the later statute and is not affected by the subsequent amendment or repeal of the earlier act containing the definition. *People* v. *Malsch* (1898), 119 Mich 112 (75 Am St Rep 381); *Wayne County Prosecuting Attorney, ex rel. Taxpayers,* v. *City of Highland Park* (1947), 317 Mich 220."

Nor is this principle of construed intent a latecomer to the Federal system:

"Criticism is made of the statute because it does not set forth the new rules but merely adopts them by a generic reference. But the criticism is without merit. The reference, as is readily understood, is to the employers' liability act of April 22, 1908, c 149, 35 Stat 65, and its amendments. This is a recognized mode of incorporating one statute or system of statutes into another, and serves to bring into the latter all that is fairly covered by the reference. *Kendall* v. *United States* (1838), 12 Pet (37 US) 524, 625 (9 L Ed 1181, 1221); *In re Heath* (1891), 144 US 92 (12 S Ct 615, 36 L Ed 358); *Corry*

v. *Baltimore* (1904), 196 US 466, 477 (25 S Ct 297, 49 L Ed 556) ; *Interstate Consolidated Street R. Co.* v. *Massachusetts* (1907), 207 US 79, 84 (28 S Ct 26, 52 L Ed 111, 114, 12 Ann Cas 555)." *Panama R. Co.* v. *Johnson* (1923), 264 US 375, 391, 392 (44 S Ct 391, 68 L Ed 748).

"The adoption of an earlier statute by reference makes it as much a part of the later act as though it had been incorporated at full length. *Kendall* v. *United States* (1838), 12 Pet (37 US) 524, 625 (9 L Ed 1181, 1221) ; *In re Heath* (1891), 144 US 92, 94 (12 S Ct 615, 36 L Ed 358, 359) ; *Interstate Consolidated Street R. Co.* v. *Massachusetts* (1907), 207 US 79, 85 (28 S Ct 26, 52 L Ed 111, 114, 12 Ann Cas 555). It brings into the later act 'all that is fairly covered by the reference' (*Panama R. Co.* v. *Johnson* [1923], 264 US 375, 392 [44 S Ct 391, 68 L Ed 748, 755]) ; that is to say, all the provisions of the former act which, from the nature of the subject matter, are applicable to the later act." *Engel* v. *Davenport* (1926), 271 US 33, 38 (46 S Ct 410, 70 L Ed 813).

Following lengthy quotation of Mr. Justice COOLEY's opinion of *People, ex rel. Drake,* v. *Mahaney* (1865), 13 Mich 481, the supreme court of Washington in *State* v. *Rasmussen* (1942), 14 Wash 2d 397 (128 P2d 318, 320), went on to describe reference statutes as follows:

" 'Statutes which refer to other statutes and make them applicable to the subject of the legislation are called "reference statutes." Their object is to incorporate into the act of which they are a part the provisions of other statutes by reference and adoption. Reference statutes are of frequent use to avoid encumbering the statute books by unnecessary repetition, and they have frequently been recognized as an approved method of legislation, in the absence of constitutional restrictions. * * * When in one statute a reference is made to an existing law, in

prescribing the rule or manner in which a particular thing shall be done, or for the purpose of ascertaining powers with which persons named in the referring statute shall be clothed, the effect generally is not to revive or continue in force the statute referred to for the purposes for which it was originally enacted, but merely for the purpose of carrying into execution the statute in which the reference is made.' 25 RCL Statutes, § 160, pp 907, 908."

Implicit in one of the supplemental briefs received since submission of these cases is allegation that necessary standards must be set up in the act by which an administrative tribunal is appointed and directed to act. We respond by quotation of the text of 1 Am Jur 2d, Administrative Law, § 116 pp 919, 920:

"The standard which is to guide the discretion of administrative agencies need not in all instances be expressly stated in the statute or ordinance. It is not always necessary to prescribe a specific rule of action to govern the exercise of powers conferred, particularly where a standard is implied in the statute or ordinance conferring the power. The standard to guide a particular act which in terms is not limited by any specific standard may be found within the framework of the statute under which the act is to be performed, or may inhere in its subject matter or purpose, and a clearly defined field of action may implicitly contain the criteria which must govern the action. Also, a standard may be found in other pertinent legislation, or an executive order, or in the field of law governing the operation of the agency. The courts will not impute to the legislature an attempt to enact an unconstitutional law, and will construe the act, when reasonably possible to do so, as vesting powers which may be lawfully exercised",

and by reference to a strikingly applicable and well-reasoned decision to which the text refers, that is,

*Senior Citizens League, Inc.,* v. *Department of Social Security* (1951), 38 Wash 2d 142, 160 (228 P2d 478). In that case the question now in discussion was decided this way:

"The significance of this declaration of section 2 of No 178[5] as a legislative guide or standard is apparent, in view of the well-known fact that Federal matching funds are made available to the States only where there is adherence to general principles and standards formulated at the Federal level. The result is that there must be read into No 178, as additional legislative standards, such of these Federal principles and standards which must be complied with in order to obtain Federal matching funds. See *Morgan* v. *Department of Social Security* (1942), 14 Wash 2d 156, 185 (127 P2d 686, 699), which dealt with this problem at length."

The fourth and last restated question, pointing as it does to absence from Act 12 of any provision for judicial review of determinations made by the highway location board, is answered by *Imlay Township Primary School District No. 5* v. *State Board of Education* (1960), 359 Mich 478, and *Board of Education of Grand Rapids* v. *State Tax Commission* (1939), 291 Mich 50. Act 12 does not undertake to *prevent* judicial review, as did the statute considered in the last cited case. See pages 53, 54 and 62 of the report thereof. Nor does it suggest intent to bar review by means of an application for and grant of any constitutional writ which, under section 4 of article 6, this Court may issue. There is hence no need for elaboration of the point, section 28 of the same article having made complementing provision for the review these appellants say Act 12 does not provide.

---

[5] No 178 was an initiative proposal amending Wash Sess Laws 1949, ch 6, was approved by the voters November 6, 1950, and held constitutional in the case in which the quotation appears. See Wash Sess Laws 1951, ch 1.—REPORTER.

## 2. Condemnation and the Federal State
Relationship.

We now turn to the second major question raised
by the Court at oral arguments and subsequently
briefed by the parties. (See *Dation* v. *Ford Motor
Company* [1946], 314 Mich 152, 160, 161.)

The crux of the legal issues posed by the Court
at oral arguments involve the construction and inter-
pretation of 23 USC § 107, which reads in part:

"(a) In any case in which the secretary is
requested by a State to acquire lands or interests
in lands (including within the term 'interests in
lands', the control of access thereto from adjoining
lands) required by such State for right-of-way or
other purposes in connection with the prosecution of
any project for the construction, reconstruction, or
improvement of any section of the interstate system,
the secretary is authorized, in the name of the
United States and prior to the approval of title by
the attorney general, to acquire, enter upon, and
take possession of such lands or interests in lands
by purchase, donation, condemnation, or otherwise
in accordance with the laws of the United States
(including the act of February 26, 1931, 46 Stat
1421), if—

"(1) the secretary has determined either that the
State is unable to acquire necessary lands or inter-
ests in lands, or is unable to acquire such lands or
interests in lands with sufficient promptness; and

"(2) the State has agreed with the secretary to
pay, at such time as may be specified by the secre-
tary an amount equal to 10 per centum of the costs
incurred by the secretary, in acquiring such lands·
or interests in lands, or such lesser percentage which
represents the State's pro rata share of project
costs as determined in accordance with subsection.
(c) of section 120 of this title.

"The authority granted by this section shall also·
apply to lands and interests in lands received as

grants of land from the United States and owned or held by railroads or other corporations."

We must inquire not only as to the authority of the Federal government to acquire, by purchase or condemnation, lands or interests in lands required for a successful construction of the proposed interstate highway, but also whether there are any conditions precedent, predicated upon State law, to the invocation of this power. In short, this Court must determine the interrelationship between the Federal act, the relevant Federal rules, and the Constitution and laws of this State.

The starting point of our analysis of these questions is the supremacy clause of the United States Constitution, art 6. The pragmatics of the situation here involved and the applicability of the supremacy clause were well stated by Justice Bradley in *Stockton* v. *Baltimore & N. Y. R. Co.* (CC D NJ, 1887), 32 F 9, 19:

"The argument based upon the doctrine that the States have the eminent domain or highest dominion in the lands comprised within their limits, and that the United States have no dominion in such lands, cannot avail to frustrate the supremacy given by the Constitution to the government of the United States in all matters within the scope of its sovereignty. *This is not a matter of words, but of things. If it is necessary that the United States government should have an eminent domain still higher than that of the State, in order that it may fully carry out the objects and purposes of the Constitution, then it has it.* Whatever may be the necessities or conclusions of theoretical law as to eminent domain or anything else, it must be received as a postulate of the Constitution that the government of the United States is invested with full and complete power to execute and carry out its purposes." (Emphasis added.)

Once we recognize the existence of the supremacy clause it is easy to understand its pervasiveness and applicability to all specific powers granted either by the Federal Constitution or by valid enactments of Congress. The operation of the supremacy clause, so well recognized in the area of interstate commerce, applies with equal force in the area of eminent domain.

In *United States* v. *Carmack* (1946), 329 US 230 (67 S Ct 252, 91 L Ed 209), the United States Supreme Court explicitly recognized this fact of constitutional law (p 240):

"The considerations that made it appropriate for the Constitution to declare that the Constitution of the United States, and the laws of the United States made in pursuance thereof, shall be the supreme law of the land make it appropriate to recognize that *the power of eminent domain, when exercised by Congress within its constitutional powers, is equally supreme.*" (Emphasis added.)

To consider the power of the Federal right of eminent domain to be any less than a full and supreme power would subvert the United States Constitution by enabling the constitutional powers of congress to be subordinated to the will of a State or city or even a private citizen. As stated in *Kohl* v. *United States* (1875), 91 US 367 (23 L Ed 449), this situation cannot exist (p 371):

"The powers vested by the Constitution in the general government demand for their exercise the acquisition of lands in all the States. These are needed for forts, armories, and arsenals, for navy-yards and lighthouses, for customhouses, post-offices, and courthouses, and for other public uses. *If the right to acquire property for such uses may be made a barren right by the unwillingness of property-holders to sell, or by the action of a State*

*prohibiting a sale to the Federal government, the constitutional grants of power may be rendered nugatory, and the government is dependent for its practical existence upon the will of a State, or even upon that of a private citizen. This cannot be."* (Emphasis added.)

Focusing more specifically upon the selective process in the exercise of the power of eminent domain, the United States Supreme Court has recognized that this is a legislative function. In *United States v. Carmack, supra,* the Court stated that designated officials selected the site in controversy out of the 22 sites suggested, and out of 2 closely balanced alternatives. The Court concluded (p 243):

"It would have been within its legislative power to exclude from the consideration of its representatives this or other sites, *the selection of which might interfere with local governmental functions.* Such an exclusion would have been an act of legislative policy." (Emphasis added.)

The foregoing authorities in the area of the Federal-State relationship compels us to conclude that the Federal power of eminent domain is complete and cannot, absent some specific statutory limitation in the Federal act itself, be conditioned by any State or local or private rights. The Court in *Kohl, supra,* at page 374, stated:

"If the United States have the power, it must be complete in itself. It can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised. *The consent of a State can never be a condition precedent to its enjoyment."* (Emphasis added.)

What applies to the States, under the language of the *Kohl* decision, must equally apply to the local municipalities.

Turning to the Federal statute, 23 USC § 107, we note that there are some limitations imposed by Federal law.   These may be summarized as the following three requirements:

(1) The State involved must request such action;

(2) The State involved must be unable to acquire the land or unable to act with sufficient promptness; and

(3) The State involved must agree to pay 10% of the cost.

Other than these three limitations, the secretary's decision to condemn or not to condemn is solely within his discretion.

For an understanding of the implementation of the Federal act and the workings of the Federal-State cooperation, we turn to the Code of Federal Regulations, Title 23 (revised as of January 1, 1968).  Section 1.3 specifies that "Each State highway department, maintained in conformity with 23 USC § 302, shall be *authorized, by the laws of the State, to make final decisions* for the State *in all matters* relating to, and to enter into, on behalf of the State, all contracts and agreements for projects and to take such other actions on behalf of the State as may be necessary to comply with the Federal laws and regulations."

We conclude from this particular regulation, and this conclusion is supported by the tenor of the Federal act and regulations, that the State highway department is given a role in carrying out the Federal government's program for an interstate highway system.[6]  Part of this role is to certify to

---

[6] See especially, 23 USC § 302'(a), which specifies that:

"Any State desiring to avail itself of the provisions of this title shall have a State highway department which shall have adequate powers, and be suitably equipped and organized to discharge to the satisfaction of the secretary the duties required by this title. Among other things, the organization shall include a secondary road unit."

the secretary of commerce, pursuant to 23 USC § 107, the State's inability to acquire the necessary lands where such situation exists.

Turning to the pertinent State law,[7] we must determine whether the State highway department has the legislative authority to initiate the operative Federal mechanism of condemnation,[8] as required by its federally designated role.

The basic authority which puts the State highway department in the road building business is Const 1963, art 7, § 16, which reads in part:

"The legislature may provide for the laying out, construction, improvement and maintenance of highways, bridges, culverts and airports by the state and by the counties and townships thereof; and may authorize counties to take charge and control of any highway within their limits for such purposes."

As part of the implementation of the constitutional provision, the legislature enacted PA 1964, No 286,[9] (the State highway department organization act), which abolished the office of State highway commissioner and his advisory board and transferred their powers and duties. Section 7(m) of this act (MCLA § 247.807 [Stat Ann 1969 Cum Supp § 9.216(7)]) specified that one of the commission's powers and duties was "to do anything necessary and proper to comply fully with the provisions of

[7] Our analysis proceeds independent of consideration of PA 1967 (Ex Sess), No 12 (MCLA 1969 Cum Supp §§ 252.151–252.158 [Stat Ann 1969 Cum Supp §§ 9.1095(51)–9.1095(58)]).

[8] We note that CFR, § 1.23(a) states that "The State shall acquire rights-of-way of such nature and extent as are adequate for the construction, operation and maintenance of a project." This regulation deals with the normal course of events in the State's highway building program. It is independent of 23 USC § 107 and is consonant with the tenor of both the Federal statute and the other pertinent regulations.

[9] MCLA §§ 247.801–247.816 (Stat Ann 1969 Cum Supp §§ 9.216 [1]–9.216[16]).

present or future Federal aid acts." This Michigan statute was not only desirable but necessary to comply with the requirements of Title 23 USC, and the functioning of the State highway department in its federally designated role (see *supra*).

This problem of invoking the Federal condemnation procedure is not new. It has been resolved under similar circumstances in several of our sister States.

In *United States* v. *Certain Parcels of Land in Peoria County, Illinois* (SD Ill, 1962), 209 F Supp 483, the Illinois department of public works and buildings, lacking the authority to condemn property already devoted to a public use, requested the secretary of commerce to condemn county park lands under the provisions of 23 USC § 107(a).

Pursuant to that request, suit was filed by the United States. The issues before the Court were whether the department had been given specific authority by the Illinois general assembly to request that the United States condemn this municipally owned and publicly used land for highway purposes, and whether the Federal power to take the land in suit is conditioned upon a valid request by the State of Illinois through its general assembly. The trial judge in his opinion in *United States* v. *Certain Parcels of Land in Peoria County, Illinois, supra,* stated (p 486):

"Defendant would seemingly have the court approach this issue from the starting point of the limitation of State law upon the authority of the department to take the land in suit. I reject that as the starting point. Defendant does not contend that the Federal act is not a valid exercise by congress of its constitutional powers. The act, being a valid exercise of the Federal power, is the supreme law of the land which cannot be limited by conflicting

provisions of State law. *United States* v. *Carmack* (1946), 329 US 230, 242 (67 S Ct 252, 91 L Ed 209). In short then, we deal with a question of the Federal power of eminent domain, uninfluenced by the limitations imposed upon the Illinois department by the laws of that State if the power of the United States is properly invoked under section 107(a) of the act."

Stressing the necessity of giving priority to the national interest and, if necessary, the subordination of local and intrastate needs to the larger national purpose, the trial judge discussed the effect of section 107(a) of 23 USC, saying (p 489):

"Although the act relates to three separate areas of Federal-aid construction, namely, the secondary system, the primary system and the interstate system, the eminent domain provisions of section 107 (a) are restricted to the 'interstate system.' The obtaining of rights-of-way for the secondary and primary systems is left exclusively under State control. Thus Congress sought to insure that completion of the interstate system be not thwarted by the inability of the States, 'for any reason', to obtain necessary rights-of-way."

He concluded that (p 489):

"The provision of section 107(a) requiring a request by a State is a conditional limitation upon the Federal power of eminent domain. The act contemplates that implementation of the interstate highway program, including right-of-way acquisition, shall be accomplished by the States to the extent possible. * * * Although the Federal power may be invoked only upon a request by a State, the required request is not to be construed as a limitation upon the power thereby invoked, but merely the means by which exercise of the Federal power is invoked in aid of the interstate program."

The Court then proceeded to discuss whether the Federal power of eminent domain had been validly invoked and noted that the general assembly of Illinois had authorized the department "to do all things necessary fully to carry out and make effective the cooperation contemplated and provided for by the Federal aid highway act." (p 490.) Pursuant to this authorization, the request was made to the secretary of commerce. The Court held that the eminent domain power of the Federal government had been properly invoked.

Upon appeal, the opinion of the trial court was adopted by the United States court of appeals and affirmed. See *United States* v. *Pleasure Driveway & Park District of Peoria, Illinois* (CA 7, 1963), 314 F2d 825.

See, also, *United States* v. *20.53 Acres of Land in Osborne County, Kansas* (D Kan, 1967), 263 F Supp 694, dealing with a similar grant of authority to the secretary of the interior as it relates to the condemnation of property owned by the State of Kansas already being put to public use; and *United States* v. *17.0098 Acres of Land (Lawncroft Cemetery)* (ED Pa, 1967), 269 F Supp 960, for a similar holding where the United States government was asked by the State of Pennsylvania to condemn Lawncroft cemetery for construction of a portion of the interstate highway system, route 95, under 23 USC § 107 (a).

It is to be noted that the language of section 7(m) of the State highway department organization act is substantially identical with the statutory language construed by the Illinois court in *United States* v. *Certain Parcels of Land in Peoria County, Illinois, supra,* at p 490, "to do anything necessary and proper to comply fully with the provisions of present or future Federal aid acts."

We conclude that since at least July 1, 1965,[10] the State has had the constitutional (art 7, § 16) and statutory (MCLA § 247.807[m]), authority to invoke the operative provisions of 23 USC § 107, unaided by any provision of PA 1967 (Ex Sess), No 12.

We have today upheld the constitutionality of the first 6 sections of PA 1967 (Ex Sess), No 12. Those six sections provide for arbitration of disputes involving the determination of routes for interstate highways through municipalities. Pursuant to these 6 sections, an arbitration board was appointed, hearings were had, and a route location made. The approval is designated as final and binding upon the department and the affected municipalities. The determination by the board, binding upon the department, is *additional authority* to invoke the operative provisions of 23 USC § 107.

Having determined that the State highway department had the authority to initiate the operative provisions of 23 USC § 107, but lacking any specific statute giving the State highway department any authority to condemn public lands, and mindful of the applicable decisions of this Court prohibiting the State from condemning public lands absent a clear legislative intent to the contrary—see *Battle Creek & Sturgis R. Co.* v. *Tiffany* (1894), 99 Mich 471; *Chicago & Kalamazoo Terminal R. Co.* v. *Grand Rapids & Indiana R. Co.* (1908), 153 Mich 686; and *Warren Township School District No. 7, Macomb County* v. *City of Detroit* (1944), 308 Mich 460—we

---

[10] PA 1964, No 286, was given immediate effect by the legislature and was approved by the governor on June 12, 1964. However, it contained a section 16 reading: "Sections 2, 5, 7, 8, 9, 10, 13, 14 and 15 of this act shall take effect on July 1, 1965, or when the present state highway commissioner no longer holds his office, whichever occurs first." Mr. John C. Mackie, the commissioner during 1964, resigned effective January 4, 1965, after election to represent the seventh congressional district.

hold that the State highway commission has the authority to certify to the secretary of commerce the determined route and its inability to condemn public lands or its inability to act with sufficient promptness and to request the implementation of the Federal power to acquire lands for the interstate system under the provisions of 23 USC § 107.

Affirmed. No costs, a public question being involved.

T. E. Brennan, C. J., and Dethmers and T. G. Kavanagh, JJ., concurred with Black and T. M. Kavanagh, JJ.

Adams, J. (*dissenting*). Because PA 1967 [Ex Sess], No 12 fails to provide any standards or guidelines for adjudicatory action by the highway location arbitration board, it is my belief that the act is an unconstitutional delegation of legislative power and consequently invalid. I am unable to agree with the majority of the Court that the act can be saved as a reference statute which adopts within its scope provisions of Federal law to implement its own operation. Since the result which I reach would render the act invalid, it is unnecessary for me to give further consideration to the other questions raised on this appeal.

### *The Background of the Cases.*

The legislature in 1967, while in extra session, undertook to provide a solution to a long-standing dispute over the route location of a portion of interstate highway 696. As planned by the State highway department, I-696 will be a freeway running across southern Oakland and Macomb counties from a western terminus at I-96 in Novi to an eastern terminus at I-94 in Roseville and St. Clair Shores, a distance

of approximately 28 miles. A 10-mile portion running from the western terminus easterly to Lahser road in Southfield has already been constructed. As of 1967, the route of the eastern portion extending from a point in Royal Oak near I-75, approximately 11 miles to I-94, had been agreed upon by the highway department and by the affected communities and construction was under way. The location of the route for the remaining 7.4 miles became a matter of dispute, culminating in this appeal.

Historically, the need for an east-west freeway through southern Oakland and Macomb counties was first documented as a result of the Detroit area traffic study which was initiated in 1953. The purpose of the study was to provide Federal, State, and local agencies with planning data as a guide in establishing highway service for the metropolitan area. Interstate highway 696 was conceived to serve that purpose as an integral part of the freeway network for the State and the Detroit area. In addition, such a highway would be eligible for inclusion in the national system of interstate and defense highways and the recommendation of the State highway department for such inclusion was approved by the Federal bureau of public roads in 1955. Location studies for I-696 were begun in 1958 and completed for the section from I-96 to Lahser road in 1959. Studies for the remainder of the route, from Lahser road to I-94, were completed in 1963. Local governmental officials were told that a decision on a common alignment was necessary by January of 1964 in order to maintain the then current Federal program schedule for completion of the interstate system. When agreement was not forthcoming, Commissioner John C. Mackie[1] selected the so-called

---

1 The present department of State highways originated with the State highway department organization act of 1964, PA 1964, No 286. That act abolished the office of State highway commissioner,

10-Mile-E-F-11-Mile alternative and announced his decision in January of 1964.

From that date on, the department of State high-- ways or its predecessor has endeavored to secure the necessary approval. When all else failed, resort was had to the legislature. In his message to the extra session of 1967, the governor made reference to the existing stalemate over route selection of the remaining portion of I-696 and said:

"Because of the importance of the project and because of the continued misuse of the veto power over its construction by certain communities, I urge this legislature to take one of two actions:

"1. Establish a reasonable form of binding arbi- tration for the resolution by the State of local dif-' ferences over freeway routes; or,

"2. Remove the existing veto power over freeway route locations from communities of 30,000 popula- tion or less, which do not contribute to the cost of. freeway construction."[2]

Act 12 resulted.

### An Analysis of Act 12.

What is the purpose of Act 12 of the 1967 extra session? Its title describes it as "An act to provide for arbitration of disputes involving the determina- tion of routes for interstate highways through mu-

---

transferring all the powers and duties of the office to a State highway commission, consisting of 4 members appointed by the governor as required by the Constitution of 1963, art 5, § 28. By the 1964 act, administrative control over the State highway department and ju- risdiction and control over all State trunkline highways was vested in the commission. The executive organization act of 1965 (PA 1965, No 380) created a department of State highways as one of the principal departments of State government, named the State highway commission as head of the department, and transferred all the powers, duties and functions vested in the State highway depart- ment to the department of State highways.

[2] Journal of the House, 74th Legislature, First Extra Session of 1967, No. 1, Oct. 10, 1967.

nicipalities and to authorize the acquisition of property therefor." The key function of the act is to provide a means for "the determination of routes" for interstate highways within Michigan where the route proposed by the highway department lies wholly or partially within the boundaries of a city or village and such proposal has met with protest and objections from municipal authorities, property owners, and others, resulting in a dispute over route location. In view of the universal rule that the right of eminent domain is inherent in State sovereignty,[3] it would appear as a first impression that the State could proceed to establish the routes for public highways with a free hand. However, although the right exists, its exercise is subject to any restrictions or limitations found in the State Constitution.[4] That there are claims by municipalities of constitutional restrictions concerning the authority of the State over streets, highways, and route locations within municipal boundaries is amply demonstrated by this appeal and by the recitals in the majority opinion. (That any claims by such municipalities pursuant to Michigan's Constitution would be subordinate to the Federal government's power of eminent domain in condemnation proceedings by Federal agencies to acquire land for the establishment of the route of an interstate highway, see part 2 of the majority opinion in this appeal.)

Act 12 proposes to resolve disputes when they relate to route locations of interstate highways by requiring "arbitration." Arbitration is an inept description of what occurs whenever the provisions

---

[3] Cf. Hendershott v. Rogers (1927), 237 Mich 338; Fitzsimons & Galvin, Inc., v. Rogers (1928), 243 Mich 649.

[4] The exercise of the power of eminent domain is a matter entirely under the control of the legislature, subject to such restrictions as are found in the Constitution. Loomis v. Hartz (1911), 165 Mich 662, 665; Hendershott v. Rogers, supra.

of the act are invoked. Customarily, arbitration is the determination of a dispute between parties by a person or persons chosen or agreed upon by them. If an affected municipality is willing to agree "to voluntary binding arbitration on the issue of route location (section 2), it is required under the act (section 3) to select, either alone or in conjunction with other similarly affected municipalities, 3 members from a list of members of the national panel of arbitrators as submitted by the governor and furnished to him by the American Arbitration Association. The 3 members so selected then constitute the arbitration board. If an affected municipality or municipalities do not agree on arbitrators within the 30-day period prescribed by the act, the governor shall choose the arbitrators. Under the statute, the arbitration board "shall function in the executive office and by majority vote shall make the determinations authorized by this act." (Section 3.) "The board shall convene at the time and place set by the governor and shall consider the submitted maps and information and shall hear representatives of the department and the affected municipalities and shall hear such other persons as are parties in interest. * * * Within 60 days of the date it convenes, the board shall approve 1 of the locations. The approval is final and binding upon the department and the affected municipalities." (Section 6.) "Approval by the board is deemed to be consent to designating the route as an interstate highway and, notwithstanding any provision to the contrary in any law, the department may forthwith proceed to acquire property, by condemnation or otherwise, deemed by the department to be necessary to provide for the completion and successful operation of the interstate highway and appurtenant facilities." (Section 7.)

From the foregoing extracts, it is obvious that the highway location arbitration board, whether constituted by agreement or by executive appointment, does perform the function of effectuating the State's policy regarding the establishment and location of the route of an interstate highway through a city or village where a dispute exists over the desirability of a proposed location. The performance by the arbitration board is adjudicatory action. "The proceeding is not one of ordinary administration, conformable to the standards governing duties of a purely executive character." (p 479.) "A proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding. Hence it is frequently described as a proceeding of a *quasi-judicial* character." (p 480.) *Morgan* v. *United States* (1936), 298 US 468, 479, 480 (56 S Ct 906, 80 L Ed 1288).

### No Standards or Guidelines in Act 12.

The majority opinion states: "Act 12, standing by itself, admittedly contains no standards within our constitutional rule." I agree with the majority that Act 12 contains no enumeration of standards or guidelines to be applied by the arbitration board in arriving at its determination. The need for such direction has a practical side in this particular legislation as well as the legal requirement. The highway location arbitration board provided by Act 12 is not a continuing board or body with a fixed term of office for its members. It is constituted for an *ad hoc* determination. A new board is created as each dispute over an interstate highway route location arises in an affected municipality. As conceived

in Act 12, the arbitration board lacks any semblance
of continuity.

## No Standards or Guidelines in Act 12 by Reference.

I agree with the majority opinion as to the rule
which permits adoption by reference of all or a por-
tion of the provisions of another statute to make
them applicable to a current legislative enactment.
This method, when properly done, has received the
approval of this Court over many years, as is shown
by the quotations from Michigan cases appearing in
the majority opinion. I disagree with the majority
holding that adequate standards and guidelines have
been established from which the extent of the powers
of the arbitration board can be ascertained and the
manner of performance determined. The only source
for such direction is a reference in Act 12 to "Title
23 of the United States Code" in connection with
defining the words "interstate highway." The refer-
ence appears only once, and then in section 1 of Act
12, as follows:

"Sec. 1.  As used in this act:
  "(a) 'Board' means   *   *   *
  "(b) 'Department' means  *  *  *
  "(c) 'Commission' means  *  *  *
  "(d) 'Interstate highway' means a highway route
on the interstate system as defined in and designated
pursuant to Title 23 of the United States Code, prior
to the effective date of this act.
  "(e) 'Affected municipality' means  *  *  *'."

I regard the above reference to Title 23 as wholly
inadequate to incorporate any standards or guide-
lines contained in Title 23 into Act 12 for the guid-
ance of the arbiters in the performance of their du-
ties. Nowhere in Act 12 is there the least statement
or instruction to the arbiters that they shall follow

Title 23 guidelines. Quite the contrary, the board is given *carte blanche* authority to "approve 1 of the locations" as proposed by the highway commission or by the affected municipalities.

### No Standards or Guidelines in Title 23.

While I do not agree that Act 12 contains a usable reference to Title 23 of the US Code, if such an assumption is made, then January 16, 1968 became the cut-off date for usable reference to the provisions of Title 23 because Act 12 went into effect on that date. Furthermore, it must be borne in mind that reference cannot be made to any other title of the US Code since none is contained in Act 12. Title 23 contains no definition, as such, of "interstate highway." However, the following does appear in section 101(a):

"The term 'interstate system' means the national system of interstate and defense highways described in subsection (d) of section 103 of this title."

Section 101(b) contains these words:

"It is hereby declared that the prompt and early completion of the national system of interstate and defense highways, so named because of its primary importance to the national defense and hereafter referred to as the 'interstate system', is essential to the national interest and is one of the most important objectives of this act.  *  *  *  Insofar as possible in consonance with this objective, existing highways located on an interstate route shall be used to the extent that such use is practicable, suitable, and feasible, it being the intent that local needs, to the extent practicable, suitable, and feasible, shall be given equal consideration with the needs of interstate commerce."

That the foregoing statement of national policy and objectives and the application thereof to be made

furnishes no adequate guidelines to the Michigan highway location arbitration board *in determining interstate routes* seems self-evident.

Proceeding as directed in section 101(a) to section 103(d), I quote the language in full, except for unimportant territorial description:

"(d) The interstate system shall be designated within the United States  *  *  *  and it shall not exceed forty-one thousand miles in total extent. It shall be so located as to connect by routes, as direct as practicable, the principal metropolitan areas, cities, and industrial centers, to serve the national defense and, to the greatest extent possible, to connect at suitable border points with routes of continental importance in the Dominion of Canada and the Republic of Mexico. The routes of this system, to the greatest extent possible, shall be selected by joint action of the State highway departments of each State and the adjoining States, subject to the approval by the secretary[5] as provided in subsection (e) of this section. All highways or routes included in the interstate system as finally approved, if not already coincident with the primary system, shall be added to said system without regard to the mileage limitation set forth in subsection (b) of this section. This system may be located both in rural and urban areas."

Section 109 of Title 23, captioned "Standards," contains nothing in the way of guidelines which could be applied *in the determination of a route location* by the Michigan arbitration board. The most nearly

---

[5] At the time of the effective date of Act 12 (January 16, 1968), the Federal department of transportation had been created, with the secretary of transportation as its head, by the passage of the department of transportation act (49 USC § 1651 et seq.) made effective April 1, 1967, by executive order No. 11340. See, 32 Fed Reg 5453 (1967). The functions, powers, and duties theretofore vested in the secretary of commerce under Title 23 of the US Code were transferred to and vested in the secretary of transportation by section 1655 of the department of transportation act.

relevant provisions appear as subsections (a) and (b) which are as follows:

"(a) The secretary shall not approve plans and specifications for proposed projects on any Federal-aid system if they fail to provide for a facility (1) that will adequately meet the existing and probable future traffic needs and conditions in a manner conducive to safety, durability, and economy of maintenance; (2) that will be designed and constructed in accordance with standards best suited to accomplish the foregoing objectives and to conform to the particular needs of each locality.

"(b) The geometric and construction standards to be adopted for the interstate system shall be those approved by the secretary in cooperation with the State highway departments. Such standards, as applied to each actual construction project, shall be adequate to enable such project to accommodate the types and volumes of traffic anticipated for such project for the twenty-year period commencing on the date of approval by the secretary, under section 106 of this title, of the plans, specifications, and estimates for actual construction of such project. Such standards shall in all cases provide for at least four lanes of traffic. The right-of-way width of the interstate system shall be adequate to permit construction of projects on the interstate system to such standards. The secretary shall apply such standards uniformly throughout all the States."

The underscored sentence was added by Public Law 89–574, effective September 13, 1966. 80 Stat 767.

It must be constantly borne in mind that the standards or guidelines we are in search of in Title 23 are those pertaining to the selection of the route for an interstate highway. The standards I have quoted from Title 23 do not provide standards or guidelines for the selection of a route but rather pertain to plans, design, and specifications for con-

struction of the highway once a route has been selected.[6] The limited function of the highway location arbitration board does not involve these. Nor are we able to turn to the standards which might well be considered to be adequate and which are contained in the provisions quoted from sections 1651 and 1653 of the department of transportation act, Title 49 USC, since the only reference in Act 12 is to Title 23 and these provisions do not appear under that title.

One of the cases cited in the majority opinion in support of the conclusion that Act 12 is a "reference statute" is *Senior Citizens League, Inc.,* v. *Department of Social Security* (1951), 38 Wash 2d 142 (228 P2d 478). In *Senior Citizens,* 10 individuals had been recipients of various types of public assistance under the provisions of an existing law, identified as initiative measure No 172 (chapter 6, Laws of 1949). In 1950, the people voted favorably on initiative

---

[6] Compare the following language of section 1651(b)(2) of the department of transportation act, Title 49 US Code (see footnote 5, *supra*):

"(2) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."

The national policy in this regard is further expanded by section 1653 (f) of Title 49 USC, which reads:

"(f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The secretary of transportation shall cooperate and consult with the secretaries of the interior, housing and urban development, and agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."

measure No 178[7] which was a comprehensive act relating to the statewide public assistance program amending in substantial respects the prior law as it appeared in chapter 6, Laws of 1949. Plaintiff-appellants brought suit claiming No 178 was unconstitutional on several grounds, among which was the claim of an unconstitutional delegation of legislative power.

The Washington initiatory measure is substantially different from Michigan's Act 12. The majority opinion of the Washington court states (pp 158, 159):

"The objectives of the legislation are rather clearly revealed when the entire act is read and considered together. Those objectives are also expressly stated, in summary form, in the declaration of legislative policy which is set forth in section 2 of No 178. That declaration reads as follows:

" 'It is the purpose and intent of this act to provide for the public welfare by making available, in conjunction with Federal matching funds, such public assistance as is necessary to insure the recipients thereof a reasonable subsistence compatible with decency and health. This act recognizes that there are possibilities of serious abuses of such a program whereby those least deserving of public aid will benefit at the expense of the deserving, and of the State and its political subdivisions, and it is intended hereby to make possible sufficient administrative control of the program of assistance to curb or at least minimize such abuses without at the same time depriving qualified applicants and recipients of the assistance to which they are rightfully entitled.'

"It will be observed that the quoted declaration of policy lays down the following standards or guides:

"(1) The purpose is to provide for the public welfare.

---

[7] See footnote 5, *ante*, p 248.—REPORTER.

"(2) Public assistance is to be made available in conjunction with Federal matching funds.

"(3) Such public assistance is to be provided as is necessary to insure a reasonable subsistence compatible with decency and health.

"(4) The act is to be administered in such way as to avoid abuses whereby those least deserving of public aid will benefit at the expense of the deserving, and of the State and its political subdivisions.

"(5) Such abuses are to be curbed without depriving qualified applicants and recipients of the assistance to which they are rightfully entitled.

"One of the most important of these guides or standards is (2), which provides that the public assistance be made available 'in conjunction with' Federal matching funds. This direction is not as broad as that contained in section 2 of chapter 6, Laws of 1949, where the intention was expressed to take 'the fullest possible advantage' of the provisions of the Federal social security act. To the extent that the two are in conflict, the provision in No 178 governs, under the theory of implied repeal. At the very least, however, the declaration in No 178 requires that the State public assistance program be so administered as to qualify the State to receive, in so far as the State's contribution permits, the fullest available measure of Federal matching funds. This intent is further borne out by the provision of section 17, chapter 6, Laws of 1929 (not repealed by No 178) declaring chapter 6 inoperative to the extent that it fails to conform to the Federal social security act."

The extracted quotation precedes the precise paragraph quoted from the Washington case in the majority opinion of this Court.

The Washington majority opinion stated that Court's conclusion on the issue of adequate standards in these words (p 161):

"Giving effect to these declarations of policy, we are of the opinion that the power conferred upon the department to fix 'maximums' and 'ceilings' is subject to sufficiently definite legislative standards to guide the department and to permit of judicial review of individual determinations. To be specific, the pertinent legislative standards assure, among other things, that the 'maximums' and 'ceilings' (1) shall not be so high or so low as to result in withdrawal of Federal matching funds; (2) shall not be so low that the resulting hardships and burdens in effect compel applicants and recipients to forego the public assistance they should have to provide a reasonable subsistence compatible with decency and health; and (3) shall not be so high as to benefit those least deserving of public aid at the expense of those most deserving.

"We accordingly hold that the provisions in question do not unlawfully delegate legislative authority to the department."

Since neither Act 12 nor Title 23 contains standards or guidelines at all comparable to the considerable State and Federal guidelines involved in *Senior Citizens,* as detailed in the Court's opinion above quoted, I fail to see how *Senior Citizens* is applicable here.

## The Second Part of the Majority Opinion.

Except for the statements dealing with Act 12 contained in the second part of the majority opinion, I agree that part 2 of the opinion states acceptable principles of law. It may be further noted that the Federal supremacy in the whole matter of interstate highways is highlighted by the case of *Road Review League, Town of Bedford* v. *Boyd* (SD NY, 1967), 270 F Supp 650. That case was an action against Allan S. Boyd, individually and as secretary of transportation of the United States, and Alexander

D. Trowbridge, individually and as acting secretary of commerce of the United States, challenging a determination of the Federal highway administrator, approved by the secretary of commerce, made under Title 23 USC § 101 *et seq.*, regarding an approved route for a portion of an interstate highway. Over objections by local authorities and conservation groups; the district judge upheld the final determination of the Federal highway administrator and the acting secretary of commerce of the route for a highway as being neither arbitrary, capricious, nor otherwise not in accordance with law.

I would reverse, holding PA 1967 (Ex Sess), No 12, to be unconstitutional as an unlawful delegation of legislative power.

KELLY, J., did not sit.